**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LATASHA SAWYER, DARREN STEELE, | ) | |
| RENEE GUSTAFSON, and | ) | |
| LAWRENCE GREEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 06-CV-5907 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JIM NICHOLSON, in his official capacity as | ) | |
| Secretary of the Department of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Five employees in the police services unit at the Jesse Brown VA Medical Center and the Office of Veteran Affairs brought this action against the Department of Veterans Affairs, alleging a discriminatory and retaliatory work environment. One of the employees voluntarily dismissed her claims. Pending before the Court are Defendant's motions for summary judgment [75, 78, 86, 92] as to the four remaining Plaintiff-employees. For the following reasons, the Court grants in part and denies in part Defendant's motion for summary judgment [78] on Plaintiff Sawyer's claims for retaliation in violation of Title VII (Count IV) and for hostile work environment-sexual harassment in violation of Title VII (Count II); grants in part and denies in part Defendant's motion for summary judgment [75] on Plaintiff Green's claims for breach of a settlement agreement in violation of Title VII (Count VII) and for retaliation in violation of Title VII (Count VI); denies Defendant's motion for summary judgment [86] on Plaintiff Steele's claim for retaliation in violation of Title VII (Count IV); and grants Defendant's motion for summary judgment [92] in its entirety as to Plaintiff Gustafson's claims. Counts II (as to Sawyer), IV (as to Steele), and VI (as to Green) remain pending.

# I.     Background

## A.     Procedural History

On October 31, 2006, Plaintiffs Latasha Sawyer, Darren Steele, Donna Watkins, Renee Gustafson, and Lawrence Green filed a nine-count complaint against Defendant Jim Nicholson, in his official capacity as Secretary of the Department of Veteran Affairs, and six additional defendants employed by the Department of Veteran Affairs.  On April 24, 2007, Plaintiffs filed an eleven-count amended complaint.  On May 14, 2007, Plaintiff Watkins voluntarily dismissed all of her claims against Defendants and is no longer a party in this suit.  On October 19, 2007, the judge previously assigned to this matter dismissed Counts I and VIII of Plaintiffs' amended complaint, leaving Defendant Nicholson as the only remaining Defendant in this case.  On May 19, 2009, Plaintiff Steele voluntarily dismissed his claim for hostile work environment-sexual harassment in violation of Title VII (Count III).  Thus, the only remaining claims in this case are Plaintiff Sawyer's claim for hostile work environment-sexual harassment in violation of Title VII (Count II); claims by Plaintiffs Sawyer, Steele, and Gustafson for retaliation in violation of Title VII (Count IV); Plaintiff Gustafson's claim for race and sex discrimination in violation of Title VII (Count V); Plaintiff Green's claim for retaliation in violation of Title VII (Count VI); and Plaintiff Green's claim for breach of a pre-determination settlement agreement in violation of Title VII (Count VII).  Defendant Nicholson has moved for summary judgment on all remaining claims.

## B.     Factual History

In view of the numerous parties in this case, the Court sets forth a brief summary of the allegations in this case, prior to addressing the specific factual backgrounds of each Plaintiff.  Plaintiffs and Defendant were, at all relevant times, employed by the Department of Veteran

Affairs ("VA") and worked at a police services unit that provided security services to the Jesse Brown VA Medical Center ("JBVA") and to the Office of Veteran Affairs, located in Chicago, Illinois. Plaintiff Sawyer worked for the VA as a secretary to Jerry Brown, the police chief at JBVA.[1] Sawyer alleges that she was sexually harassed by Brown (Count II), and that, after she complained of the harassment, the VA repeatedly retaliated against her (Count IV). Plaintiff Steele, a police officer, alleges that after he cooperated with investigators regarding other employees' EEO complaints, he was falsely accused of patient abuse, suspended, reassigned from jobs, and had his weapon taken away (Count IV). Plaintiff Gustafson originally was a police officer in the police services unit but later was promoted to a police supervisory position in the Office of Veteran Affairs. Gustafson alleges that she was suspended and pressured to change her testimony after she served as a witness on behalf of Plaintiff Steele at an Administrative Investigation Board hearing (Count IV) and was denied mandatory supervisory training and not promoted to the lieutenant rank due to her race (Caucasian) and sex (female) (Count V). And finally, Plaintiff Greene, also a police officer, alleges that Defendant retaliated against him for engaging in EEO activity (Count VI) and that Defendant breached an EEO settlement agreement arising from a prior EEO action (Count VII).

### 1. Latasha Sawyer

Latasha Sawyer began working at the JBVA in May 2003 as an automation clerk in the Environmental Services department.[2] While in Environmental Services, she did not have any problems with harassment, discrimination, or retaliation. In September 2004, Jerry Brown, Chief

---

[1] The parties do not dispute the fact that Brown had supervisory authority over each Plaintiff.

[2] Based on the record, the Environmental Services department is part of the JBVA Management Service unit.

of Police at the JBVA, hired Sawyer as a secretary for the police services unit.[3]  The police services unit was predominantly male, employing only six women out of a total of forty employees.  In her position, Sawyer's responsibilities included administrative duties, time cards, purchasing, and organizing technical support.  From the start of her employment at the JBVA through August 2005, her performance appraisals demonstrated that she was meeting all of Defendant's employment expectations.

Sawyer alleges that Chief Brown began sexually harassing her in September 2004 and continued to do so through the time she initiated an EEO claim in August 2005.  According to Sawyer, Chief Brown made sexually explicit comments about Sawyer's body, such as:  (1) "They're pointing to me saying hi"; (2) "I know you're in here because your headlights are on"; (3) "no your big titty ass didn't"; (4) "It gets cold and they stand up and look right at you"; (5) "Oh, it must be cold in here because your headlights are on"; and (6) "I bet you do all kinds of stuff with those lips."  Sawyer also testified that Brown sexually harassed her by making inappropriate comments about his own body and sex life, such as:  (1) discussing his "tube steak" in front of her; (2) telling Sawyer his wife lived out of town; (3) stating "she just wants my tube steak; and (4) telling Sawyer that women were calling and leaving him messages because they wanted "some of his tube steak."

Another way in which Sawyer alleges that Brown sexually harassed her was to make references to Sawyer engaging in sexual acts, including:  (1) asking Sawyer, "What are you doing with tint on your car [windows]?  With those lips of yours, no telling what you be doing.  I know why you got the tint;" (2) making allegations that Sawyer was "messing around with" Darren Steele, a co-worker; (3) alleging that Sawyer was engaging in a "threesome" with a male

---

[3]   Chief Brown began working in the police services unit in 2004, and, during much of his tenure, he also performed the police chief duties at the Hines VA facility.  Brown had authority to hire employees, discipline employees, and recommend terminations to the human resources department ("HR").

and female co-worker; (4) asking Sawyer if she was involved in "running a train" on Darren Steele; (5) stating "You [Sawyer] would feel better if you had a little of my tube steak"; and (6) stating that Sawyer "just wanted to be wolf packed." Plaintiff Darren Steele testified that he witnessed Brown say some of the above-referenced comments to Sawyer. Donna Watkins also told an EEO counselor that she heard Brown make inappropriate comments to or around or about Sawyer.

In response to Brown's behavior, Plaintiff testified that she first tried changing the subject when he would make inappropriate comments. Plaintiff further testified that she would say: "Why do you have to say that? Don't say that"; or "Look, this behavior is not right, and its making me feel uncomfortable. You're making these comments around officers, and I don't want them to think that I'm this type of person." Then, on August 10, 2005, Sawyer had a meeting with Brown and again advised Brown that his comments were unwelcome and offensive. Sawyer asked him to stop talking to her in a demeaning manner and limit their conversations to business-related issues. After Sawyer requested the meeting, Brown made a comment that Sawyer needed to "go home and get some."

On or around August 15, 2005, Brown informed Sawyer via e-mail that he would be conducting an audit of Sawyer's purchases for the last sixty days. Following Brown's decision to relieve Sawyer of her purchasing duties, Sawyer did not go to work on August 16 and 17. Viewing the record in the light most favorable to Sawyer, it appears as if Sawyer properly called in and requested sick leave, but she was charged with being AWOL (the first occurrence during her employment at the VA). On August 18, Geraldine Webb heard a commotion in Brown's office, heard Sawyer cuss, saw Sawyer exiting Brown's office crying, heard Sawyer express disbelief that she had been charged with being AWOL and remark, "I'll get his ass. I'll go

upstairs and get the white man on his ass." When Sawyer explained that she had taken sick leave for those two days, the AWOL status was removed from her record.

On August 19, Brown relieved Sawyer of her purchasing duties, although Sawyer had e-mailed Brown on August 17. There is conflicting evidence whether Sawyer requested that she be relieved of her purchasing duties, or whether she wanted to keep them. There is no evidence that Brown had ever removed any of Sawyer's duties or requested an audit of her purchases prior to their meeting on August 10, 2005.

On August 19, 2005, Sawyer made contact with the EEO office to initiate a claim of sexual harassment against Brown.[4] Brown was apprised of the allegations. Within a few days of Sawyer's EEO complaint, the VA reassigned Sawyer to Emergency Management Services[5] and convened an independent Administrative Investigation Board ("AIB") to investigate Sawyer's allegations. The AIB investigation was separate from the EEO action. Associate Director Blakely identified three required corrective actions that were to be documented into the AIB record by the end of December 2005: (1) that the Acting Director initiate appropriate disciplinary actions toward Brown; (2) that the Acting Director initiate consultation between the police services unit and the National Center of Organizational Development, and (3) that Brown provide officers with written Standard Operating Procedures and training. There was no documentation, and no entries in the AIB record, to reflect that any of these actions were taken.

---

[4] Sawyer attempted to report Brown's conduct on August 18, 2005, but Associate Director Michelle Blakely was out of the office that day.

[5] Emergency Management Services is part of the JBVA Management Service unit (where Sawyer had worked prior to becoming Brown's secretary). According to Sawyer, this reassignment was inconsistent with the sexual harassment policy that required the harasser, not the victim, to be transferred. Blakely testified in her deposition that "ideally you would move the person who was the alleged aggressor," but since there was no assistant chief, they decided to move Sawyer.

On August 25, 2005, the Office of the Inspector General received an anonymous complaint involving allegations that Sawyer used her computer at work to process income tax returns for employees and personal associates, and that non-VA employees were reporting to Sawyer's work station to have their tax returns processed. After an investigation, the AIB found the anonymous complaint to be unsubstantiated.

On August 29, the EEO counselor closed the informal complaint process on Sawyer's sexual harassment claim. On September 14, 2005, Sawyer filed a formal EEO complaint of sexual harassment and reprisal, alleging that the sexual harassment had been ongoing throughout her time in the police services unit and that she had suffered reprisal since August 10, when she demanded that Brown stop his behavior.

On September 22, 2005, Sawyer went to see Dr. Feldman in the Women's Health Clinic at JBVA for depression as a result of a sex trauma. Because of the nature of her "stress" (her sexual harassment claim), she was referred to an outpatient clinic. At the clinic, Sawyer gave the counselor a physician's report to fill out. According to Sawyer, the counselor told her in a subsequent phone call that she could not fill out the report due to a conflict of interest which arose from the fact that the JBVA was its parent facility. The counselor advised her to go to a private physician. On October 7, 2005, Sawyer contacted the EEO counselor to add a claim based on the clinic's refusal to fill out the paperwork.

Sawyer and another JBVA employee viewed Emergency Management Services as a "dumping ground" for employees who were on their way "out the door." Sawyer's stay there was brief. When she alerted VA officials that she was uncomfortable in Emergency Management Services, she was reassigned to a position answering calls for Hurricane Katrina disaster relief. In October, when the position ended, the VA offered Sawyer a position at the

JBVA information desk, which she declined because she feared for her safety at the JBVA facility. She then was offered a position in the Logistics unit at the VA Lakeside campus, which she accepted. Natalie Dunn, Chief of Logistics, became her supervisor.

Dunn and Sawyer were at odds from the start. Although they were at separate facilities – Dunn's work station was at the JBVA while Sawyer's was at the Lakeside campus – Sawyer claims that "Dunn had [her] under surveillance." Sawyer alleges that she was required to call and notify Dunn whenever she left her office for any period of time, even to go to the bathroom, and that other supervisors would contact Sawyer at the start of each shift for attendance purposes. Dunn disputes many of Sawyer's specific allegations, but admits that she ultimately formed the opinion that Sawyer lied, played games, had a very bad attitude, wanted special treatment, and ultimately wanted to get administrative leave so that she could stay home and still get paid.

On October 12, 2005, Sawyer requested four hours of Family Medical Leave or Sick Leave to be used on October 17 and eight hours of annual leave to be used on October 18. Dunn asked Sawyer for documentation to support the leave request because Sawyer had an insufficient leave balance. On October 14, Dunn refused to approve Sawyer's request for leave. That same day, Sawyer sent a memorandum to Blakely, stating that she felt uncomfortable with Dunn's comments to her and that she felt like Dunn had her under surveillance. Also on October 14, Sawyer prepared a signed statement, recounting the following: Dunn phoned Sawyer and told her that Sawyer's complaints were "garbage," that she had a chip on her shoulder, and that Sawyer would not receive special treatment because of her EEO complaint. Sawyer also alleges that Dunn, during the course of another attendance dispute, told her: "I don't know who you think you are, but you must not know who I am. You just don't know who you're fucking with.

I deal with bitches like you every day and I am not going to let you or no one (sic) run this department. I am the one in charge. I am the one with the delegation of authority and that means I can do whatever I want to do with you * * * * I'll get a family member your age to kick your ass." Dunn denies making these statements. Sawyer filed a police report with the Chicago Police based on this alleged incident, and Dunn was questioned by a Chicago Police Department detective. Sawyer ultimately contacted the EEO counselor to add a claim of retaliation and harassment based on her interactions with Dunn and the denial of her leave request.

On November 30, 2005, the AIB – which was convened to investigate Sawyer's complaint of sexual harassment – issued its findings, including that "the use of profanity and telling various types of jokes appears to be the norm in the VA Police." One employee testified that officers would make remarks about women "basically every day" that "kind of" had a sexual nature, which he described as "high school stuff." He further testified that the officers discussed "who they wouldn't mind hooking up with, as they put it." Plaintiff Green testified that he knew of one time in October or November 2005 when an employee brought in a sex tape on a DVD and played in on the computer. Green ordered him to turn it off. Officer Steele reported to his supervisor that on two or three occasions, there were sexually explicit magazines in the locker room, in addition to a poster of a bikini clad woman. Donna Watkins testified, "They'll go so far as pulling your hair and saying you like that, don't you?"

After conducting an investigation into allegations of police misconduct that had been raised in an anonymous letter, the VA Inspector General's Office concluded that some officers misused the security cameras to zoom in on female body parts, including breasts, genitals, and buttocks, while women were walking through the corridors of the hospital. The Inspector recommended that the facility develop a policy as to the proper use of security cameras with

specific language on prohibitions on its use. In her deposition, Sawyer testified that she did not have personal knowledge of the inappropriate use of security cameras because she did not work in that area.

After her initial EEO claim, Sawyer saw an EEO counselor to add the following retaliation claims: (1) her reassignment out of the police unit in August 2005; (2) an alleged "gag order" not to speak with her after she filed her EEO claim; (3) Dunn's inappropriate comments about Sawyer's leave requests; (4) Dunn's intimidating questions about Sawyer's whereabouts and the entry of AWOL under Dunn's supervision; (5) encountering a VA police officer observing and taking notes about Sawyer's car in the parking garage in November 2005, after she had provided information for her EEO claims; (6) an anonymous letter (written three days after her demand that the police chief stop harassing her) accusing her of using her work computer to complete tax returns; (7) AWOL entered on January 9 and 10, 2006; (8) Dunn's threats in January 2006; and (9) the VA counseling center's refusal to fill out her worker's compensation paperwork. Sawyer's reprisal claims were consolidated with her sexual harassment claim.

Sawyer also sent a letter to the VA's Chief Policy and Compliance Officer in Washington, D.C. to complain that the conduct of the EEO investigative staff was unethical and inappropriate. Sawyer complained that she was asked inappropriate and unseemly questions during her interview (such as what bra size she wears and whether she thought she had large breasts) and that the EEO investigator "had the audacity to go to the wrongdoers and notify them of [her] testimony." Sawyer warned the EEO office that she would be filing a suit and that the D.C. office also would be a named defendant. In a letter dated December 28, 2005, the VA's Chief Policy and Compliance Officer in Washington, D.C. responded to Sawyer's complaints

regarding the processing of her EEO complaint by apologizing for any inappropriate comments and questions, assigning a new EEO investigator, and explaining to Sawyer that EEOC regulations require an EEO counselor to inform management officials of any allegations made against them.

In February 2006, Sawyer was notified that the AIB had investigated her claims of sexual harassment and concluded that the evidence did not substantiate her allegations. In March 2006, the VA separated the police service operations at the JBVA and Hines VA Hospital, and designated Chief Brown as the police chief at Hines VA with duties as Acting Chief at the JBVA until a replacement was selected. In May 2006, Blakely met with Sawyer to discuss whether she had any reservations about returning to her secretary position in the police unit. Sawyer was told she would be working under Martin Anderson, who recently had been selected as the Assistant Chief. Sawyer agreed to the assignment. While Martin was in training, Sawyer temporarily was under the supervision of Chief Brown. During the approximately six-week period, Sawyer "really didn't see him" much, they did not communicate except through e-mail, Brown approved Sawyer's leave requests, and he did not engage in any inappropriate comments or conduct. However, on June 13, 2006, Sawyer contacted the EEO counselor to add additional claims of retaliation and hostile work environment because she was under the temporary supervision of Chief Brown.

Assistant Chief Anderson returned from training on June 26, 2006. On July 17, Sawyer contacted an EEO counselor with complaints of hostile work environment and retaliation related to Anderson. Sawyer claimed that (1) Anderson rummaged through her desk drawers, (2) denied her access to the file cabinet which he moved into his office and kept locked when he was absent, (3) instructed her to keep her office door open at all times, (4) accusing her of four hours

of AWOL in July, (5) told her that "I am trying to start off on the right foot but you are making it very hard," and (6) failed to inform her of his whereabouts or work assignments. Sawyer felt that Andersen had "temper issues," was "hostile and belligerent," and was "just totally disrespectful." She testified that he would either scream at her, put his hand up at her as a gesture to be quiet, walk away from her, or just look at her.

Andersen was equally unhappy with their working relationship. Andersen believed that Sawyer hid in her office with the door locked to avoid work, was missing half the time, would not complete assignments that he gave her, and was always on her cellphone. He instructed her to keep her door open and when she refused, he would prop the door open. He denied going through her personal items. Sawyer's reassignment to the police department lasted seven months, from May to November 2006, and she testified that she felt harassed the entire time.

In November 2006, inspectors from the VA's central office reviewed the JBVA police unit and determined that its program was the worst it had ever seen. The deficiencies included missing files and paperwork. The VA brought in a temporary acting police chief, Lee Daniels, from a VA facility in Texas to restructure the police department. Daniels and Blakely determined that Sawyer should not remain in the police unit. Blakely concluded that whenever a supervisor in any of Sawyer's assignments did not give her what she wanted, she claimed retaliation. Blakely laterally reassigned Sawyer to a clerk position in patient administrative services; although Sawyer did not want to remain in the police unit, she protested the reassignment because she was pregnant and worried about exposure to communicable diseases.[6] Sawyer's new duties included greeting visitors, answering phone calls, paging nurses, interacting with doctors and patients, and checking patient orders. After reassignment, Sawyer frequently

---

[6] The entire JBVA medical care facility – including the police unit within the facility – was designated as a patient care area.

claimed that she was getting sick. After five months in patient services, she felt that she "had no other choice but to leave, because it was based on my health." Sawyer resigned in April 2007.

## 2. *Lawrence Green*[7]

The VA hired Plaintiff Lawrence Green as a police officer at the JBVA in 1990. In April 2004, the VA announced three vacancies for the supervisory police officer position, and Green applied. Green was not selected for any of the vacancies. In May 2004, Green brought an EEO action to complain that his non-selection was retaliation for a prior EEO complaint. Green received a promotion in settlement of his EEO claim, which was to become effective on August 21, 2005.[8] The VA notified Green that, pursuant to VA regulations, he must serve a one-year probationary period during which time he could be removed for deficient performance and returned to his original position as a police officer. Green acknowledged and signed the notice requiring him to serve the probationary period. Assuming that all went well during this probationary period, Green would rise to a GS-8 position.

Green alleges that his colleagues, including both subordinates and superiors, engaged in retaliation in response to his EEO activities from the moment that the settlement agreement took effect. According to Green's understanding of the settlement agreement, he was to be promoted on August 21, 2005. However, Green was not promoted until September 14, 2005, and he did not receive his credentials until October or November 2005. Green did not receive a supervisor manual or the ninety day orientation, including forty hours of training that supervisors are required to receive. Green also did not receive feedback to which he claims he was entitled under VA policy. Green testified that when he brought concerns about the actions of fellow

---

[7] Defendant did not file a response to Plaintiff Green's Rule 56.1 Statement of Additional Material Facts [114]. Therefore, all of Plaintiff Green's additional material facts are deemed admitted.

[8] The circumstances under which Green received his promotion were widely known among his colleagues at the JBVA, earning him the title "EEO King."

officers to his superiors, his supervisors failed to investigate the allegations and instead encouraged the officers to file EEO complaints against Green. In a similar vein, Green testified that his superiors encouraged officers under his supervision to write false reports about him and not to follow Green's orders.

In September 2005, Green complained about being removed from the shift schedule.[9] Green was told that it did not matter that he was not on the schedule because he knew when his shifts were. All other officers were placed on the schedule during this period. In October 2005, Green had a heated argument in public with another supervisor, Lt. Manning, and both got a "butt-chewing" from the police chief in an e-mail and in person. While nothing went into either of their personnel folders as a result of the incident, Green was issued a letter of reprimand while Manning was not. Green testified that this occurred despite the fact that he was attempting to prevent Manning from verbally abusing an officer under Green's supervision.

In November 2005, Green was asked to rewrite an incident report three times. According to Defendant, Green's report was unacceptable given the seriousness of the issue and the fact that it involved "racial overtones." Green testified that the report was adequate in light of other reports that were deemed acceptable. Then, in April 2006, Green directed two officers to complete paperwork related to an arrest that Green had made. The officers refused to complete the work because Detective Smith had told them not to assist Green. According to Detective Smith, it is the duty of the arresting officer to complete any necessary paperwork; however, Green testified that it is common for supervisors to enlist the assistance of junior officers in completing paperwork and that he was supervising their efforts. Green also testified that he was threatened both by superior officers – "You don't know who you are talking about. Anybody's a

---

[9]  Green also was removed from the schedule between April 2006 and June 2006.

Mason. They can – we can harm you or get you" – and by subordinate officers – "[W]e are going to put a fire under Green's ass and Chief Brown will back us up."[10]

Eventually, Brown demoted Green, largely on the basis of two events. At some time around May 2006, Officer Chaney, an officer under Green's supervision, reported to Green that his bullet resistive vest was missing. Neither Green nor Chaney filed an official report stating that the vest was missing until Green made a report on the instructions of Brown on June 6, 2006. Defendant claims that it was Green's responsibility to report the missing vest and that he failed to do so in a timely manner. Green claims that it was his understanding that he was not responsible for reporting the missing vest, that it was Chaney's duty to report the vest missing, and that Chaney was going to make the report. Green testified that, despite believing he had no duty to report the vest missing or locate a replacement, he repeatedly informed his superiors of the missing vest, making it their responsibility to provide a replacement vest, as they were the only ones with the means to provide a replacement.[11] Defendant denies that Green ever notified his commanders.

A VA detective commenced an investigation for theft of government property. Green told the investigator that he was unaware that VA policy required all on-duty armed police officers to wear vests. Green allowed Chaney to work without a vest for twenty-five days before Green was instructed to file a uniform offense report. The memo prepared by the VA detective states that Green did not inform the police chief or assistant police chief about the missing vest; however, Green was not reprimanded at the time of the incident. In November 2006, a department-wide

---

[10] While these statements are relevant to determining the existence of retaliation directed at Green, Plaintiffs' speculative allegations of a Masonic conspiracy at work in the JBVA are too tenuous and unsubstantiated to constitute a stand-alone claim.

[11] Lieutenant Carter was in charge of procuring new vests and was aware of the missing vest sometime in May 2006.

investigation was conducted in connection with bullet resistive vests. The investigation found that over half of the officers at the JBVA did not have fully functional bullet resistive vests and some did not have a vest assigned to them. The investigation also found that most supervisors were unaware of program requirements.

Green also was accused of failing to distribute firearms in accordance with VA policy on two occasions. According to VA policy, firearms are kept in gun lockers and are to be removed from their lockers only when the officer to whom the firearm is assigned provides the gun locker key to his or her supervisor, who then opens the gun locker and provides the firearm to the officer. Three officers reported to Brown that between June 13 and June 15, 2006, they twice arrived at the armory to find that their firearms had already been removed from their gun lockers and placed on a counter. They testified that Green used a master key to unlock each locker and remove the weapons. The officers said that they were concerned because each officer is responsible for his weapon. Green testified that these events never occurred and that it was impossible for him to have removed the guns without the officers' keys because he did not have access to a master key. According to VA policy, the master key is maintained as a controlled key, to be used only by the chief, assistant chief, and firearm instructor/armorer. Defendant offers no theory as to how Green, who was not the chief, assistant chief, or a firearm instructor/armorer, obtained a master key.

Two of the three officers who reported Green for firearm violations were officers that Green testified he overheard saying, "[W]e are going to put a fire under Mr. Green's ass, and Chief Brown will back us up" shortly before the incident. Green testified that Brown instructed the third officer to file a false report. Another officer, who Green's accusers allege was present during the incident, denied witnessing the events as alleged by the three officers when he was

questioned by Detective Gilliam. Green was not disciplined for failing to distribute firearms in accordance with VA policy at the time of the incident. However, Brown did issue Green a letter of inquiry asking for Green's response to the allegations, and Green denied violating the firearms policy. Brown also notified Green in an e-mail that Green's subordinates lacked confidence in him and complained that Green publically disrespected them and lacked knowledge when they sought his advice.

Green contacted an EEO officer to complain of retaliation and a hostile work environment on July 6, 2006, and again (through his attorney) on July 20, 2006. On July 11, 2006, five days after Green contacted an EEO officer, Brown proposed that Green be demoted for (1) failing to ensure that the police operations journal was annotated with an entry of missing government property; (2) failing to prepare a VA Police Uniform Offense Report; (3) failing to ensure the safety of a subordinate officer by allowing him to work without a bullet resistive vest for twenty-five days; and (4) violating established firearm policy.[12] The demotion became effective on August 6, 2006, sixteen days before Green's probationary period was set to end. Green failed to challenge this decision within the ten days provided. Green states that he did not do so because he was denied access to the evidence file relating to his demotion.

Both of Green's performance reviews, in August 2005 and May 2006, found him to have met the expectations of a G-7 supervisor. He also received an incentive award in April 2006 for excellent supervisor leadership in a time of crisis, and Brown testified at his deposition that he did not have any concerns with Green's work performance. Lieutenant Tucker wrote a letter on

---

[12]    The claims of retaliation (emanating from Green) and the claims of inadequate performance (emanating from Green's superiors) did not cease with Green's demotion. For example, on August 4, 2006, Acting Chief Anderson issued Green a letter of inquiry about inconsistencies in Green's entries in the firearms log. *Id.* Also on August 4, 2006, Green added his demotion and other incidents to his EEO complaint. *Id.*

Green's behalf stating that he believed Green was not treated fairly during his probationary period, and in particular that he was treated differently than other supervisors. Brown testified that Green was not disciplined at the time that Brown became aware of the two incidents because any such action would necessarily have resulted in Green being demoted. Contrary to Brown's reasoning, HR specialist James Lampada stated in his deposition that an officer on a probationary period is not automatically demoted if he is disciplined. Green was the only person that Brown demoted in his tenure as Police Chief at JBVA.

On September 5, 2007, Green filed a formal EEO complaint alleging hostile work environment, retaliation, and breach of the settlement agreement. Specifically, Green cited the following thirteen incidents of reprisal/harassment/hostile work environment: (1) his promotion was delayed by Chief Brown until September 2005; (2) in October 2005, Green was reprimanded and written up for a dispute with another officer, while Brown failed to issue a reprimand to the other officer; (3) in November 2005, Green prepared a report which Chief Brown rejected as unacceptable three times; (4) in April 2006, Green directed two subordinates to complete paperwork on an arrest but they refused stating that Detective Smith told them not to assist Green; (5) in June 2006, Chief Brown issued complaint letters falsely accusing Green of being out of uniform and improperly transporting x-rays; (6) on June 21, 2006, Officer Howard wrote a false report about Green, which resulted in Chief Brown disciplining Green; (7) in June 2006, Green overheard two police officers state that "we are going to put a fire under Sgt. Green's ass and Chief Brown will back us up;" (8) from April 2006 through June 2006, Green asked to be "put on the schedule" but was told that there is no need since he knows what shift he works; (9) on June 1, 2006 Detective Smith threatened Green; (10) on June 10, 2006 Chief Brown threatened Green; (11) on June 14, 2006, Officer Billingsly wrote a false report about Green as

ordered by his supervisors; (12) on July 14, 2006, after Green wrote up a white police officer, Officer Tomchek, for threatening ER doctors into giving him prescriptions, Chief Anderson, who also is white, contacted the EEO office to complain that Green had discriminated against Officer Tomchek; and (13) on July 6, 2006, Chief Brown instructed HR Specialist Lampada to fail Green in his probationary period as a supervisory officer and Green was subsequently demoted for unfounded reasons by way of an unsigned letter.

### 3. Darren Steele[13]

Darren Steele began working as a police officer at the JBVA in 2004. On August 22, 2005, Steele and co-plaintiff Renee Gustafson were working at the entrance of the VBA. A patient (also referred to as "Finney") attempted to enter the facility with a pocket knife and was informed that he would not be able to enter the hospital while in possession of the knife. The patient became belligerent, yelling "Fuck you! I don't see why I can't bring my knife in here!?! You fucking people let Al Qaida in here!" The patient eventually went outside, and disposed of the knife before reentering. However, because of the patient's disorderly conduct, Steele and Gustafson agreed that they would not allow the patient to enter the VBA.[14] Upon reentering, the patient continued to complain loudly and use profanities and racial epithets. At one point, the patient proclaimed, "I'm a grown fucking man, nobody tells me what to do," and "fuck you . . . I am not going anywhere." Following these disruptions, a physical altercation ensued between the officers and the patient, resulting in the arrest of the patient. Throughout the encounter the patient continued to use profanity and make references to Al Qaida. At various points during the

---

[13]  As with Plaintiff Green, Defendant did not file a response to Plaintiff Steele's Rule 56.1 Statement of Additional Material Facts [106]. Therefore, all of Plaintiff Steele's additional material facts are deemed admitted.

[14]  Informal VBA policy does not allow disturbances within the VBA, and Steele testified that he was following the policy.

encounter the patient attempted to strike Gustafson and at one point attempted to knee Steele in the groin. The parties do not dispute that the patient flailed his arms toward the officers; however, the parties dispute whether the patient attempted to strike Gustafson prior to being arrested or while he was being arrested. While Steele originally filed a police report which stated that the patient attempted to strike Gustafson before they attempted to restrain him, Steele later stated that, because the whole incident took place in only a few moments, he may have been mistaken about the order of events. The patient subsequently submitted a complaint alleging that Steele attacked and arrested him without provocation.

Gustafson's submitted a witness statement that mirrors Steele's original account of the events. However, Gustafson has always maintained that the patient attempted to strike her before she and Steele attempted to restrain him. Gail Pike, who works as a field examiner for the defendant at the VBA and who was present at the time of the incident, also corroborates Steele's account of the incident. Pike testified in an affidavit that Steele attempted to calm the patient down but "[i]n order to protect himself and Stg. Gustafson and other individuals coming in the building Officer Steele had no recourse but to subdue [Finney]." Steele initially was commended for making the arrest.

On August 29, 2005, Steele gave informal testimony in support of co-plaintiff Sawyer's allegations of sexual harassment to an EEO counselor. According to Steele, and not refuted by Defendant, Brown learned about Steele's testimony "in late August."[15] Steele again testified in support of Sawyer on September 14, 2005, for the AIB investigation into Sawyer's sexual harassment complaint, and on November 28, 2005, for Sawyer's EEO complaint investigation.

---

[15]  As previously noted, Defendant did not file a response to Steele's Rule 56.1 Statement of Additional Material Facts [106]. Therefore, Steele's assertion regarding when Brown heard about Steele's testimony on behalf of Sawyer is deemed admitted. To the extent that it conflicts with Defendant's statement of fact on this issue, the Court views the evidence in the light most favorable to Steele.

On August 29, 2005, a week after the incident and the same day that Steele testified against Brown in Sawyer's EEO case, an AIB was launched to investigate the allegation of patient abuse that had been brought against Steele. This investigation was launched at the discretion of management. Michelle Blakely testified that prior complaints of patient abuse had been made against Steele, but that those allegations were never investigated.

Defendant provided video footage to the AIB for use in its investigation. Plaintiff maintains that the video footage was altered and that the portions of the video showing the patient emptying his pockets and displaying his knife were cut. The videotape did not have audio, was of poor quality, and was difficult to see in parts. On October 19, 2005, the AIB issued a report. The board found that the patient became loud and profane after Steele and Gustafson refused to allow him to enter with his knife, and that he continued to act in that manner when he returned to the VBA after disposing of his knife. The board concluded that, if Steele's decision to arrest the patient was based on the disturbance that the patient caused, then the decision was reasonable given the JBVA policy suggesting this course of action in such instances. The board also determined that there was no evidence to indicate that undue force was used to arrest the patient and that any injuries he may have sustained were not the result of malicious action by Steele or Gustafson. Defendant maintains that the board also concluded that the video surveillance footage demonstrated that testimony by Steele and Gustafson that the patient attempted to strike Gustafson before the arrest was initiated was false, but that if the decision to arrest the patient was based solely upon an attempt by the patient to strike Gustafson, then the decision to arrest the patient was not valid. Steele disputes that the board reached this conclusion, and, as previously noted, Defendant failed to respond to Steele's statements of

additional facts.  Finally, the board concluded that "[t]he lack of a written policy or Standard Operating Procedures for VA Police to follow at the VBA building contributed to this incident."

Shortly after the AIB issued its report, Brown suspended Steele's arrest authority, removed his weapon and credentials, and assigned him to desk duty pending resolution of the findings made by the AIB.  On October 31, 2005, Steele contacted an EEO counselor to complain that his arrest authority had been suspended and his weapon and credentials had been removed in retaliation for providing testimony in support of Sawyer's complaint.  On November 2, 2005, Blakely formally notified Steele that the actions taken by Brown in response to the AIB findings would continue until an appropriate corrective action could be determined.

On January 19, 2006, the AIB reopened its investigation on the instructions of Central Office after the office received an anonymous letter raising concerns about the treatment of officers at the JBVA, including Officer Steele.  The AIB was reopened, at least in part, to allow Steele and Gustafson the opportunity to address any inconsistencies between their AIB testimony and the surveillance footage.  Both Steele and Gustafson gave new testimony.  While Gustafson continued to maintain that the patient attempted to strike her before an arrest was initiated, Steele stated that he may have been mistaken about the order of events and that the patient may have attempted to strike Gustafson only after they began to arrest him.  In any event, Steele maintained that due to the patient's disorderly conduct (which the board already determined was a valid reason for the arrest), the arrest was necessary.

The second AIB issued supplemental findings on April 6, 2006.  The board concluded that, because of its poor quality, "the video surveillance footage cannot be considered 100 percent reliable in ascertaining what took place."  The board further concluded that

> In an incident such as this one, it is difficult to fault members of Police Services, who have to make quick decisions on the most effective and safe way to deal with

emotionally charged individuals. A review of the surveillance tape illustrated how quickly the incident escalated and it can be difficult to recall the exact sequence of events. There is no doubt that Mr. Finney attempted to strike out at Police while being arrested, but whether it happened as Officer Steele and Sgt. Gustafson initially approached him or immediately afterwards is only a difference of several moments.

The board also made explicit that its new findings were inconsistent with the conclusions of the original AIB that the testimony given by Steele and Gustafson to the original investigation was false and that, if the decision to arrest the patient was on the basis of an attempt by the patient to strike Gustafson, then the decision was invalid. The board did not investigate allegations of false police reports or providing false testimony in an investigation and made no recommendations on discipline.

AIB investigations at the JBVA typically last a matter of weeks or even days. The AIB investigation into possible patient abuse by Steele took approximately ten months. Between October 2005 and August 2006, while the AIB investigations were ongoing, Brown removed Steele's credentials, arrest authority, and weapon. There is no policy that requires such actions while an AIB investigation is being conducted, and Defendant did not identify analogous occasions where such actions were taken. During this period, Steele was assigned to a post that required a firearm despite the fact that he was not permitted to carry a firearm. Steele testified that he feared for his safety during this period.

On May 29, 2006, Brown proposed a fourteen day suspension of Steele for: (1) using excessive force in the August 2005 arrest; (2) making a false written statement in an incident report; and (3) providing false testimony to an AIB. The suspension was issued on June 28, 2006, and Steele served his suspension from July 9, 2006 until June 23, 2006. James Lampada works in human resources at the JBVA and was involved in completing the paperwork for

Steele's suspension. He stated that he was instructed not to use the AIB's additional findings in completing the paperwork.

Steele also testified that he was subject to the following additional retaliatory actions after he testified in favor of Sawyer: (1) on September 1, 2005, Brown cancelled training in which Steele was scheduled to take part and that was required for certain additional duties and promotions; (2) senior officers warned Steele that his EEO activities could hurt his career, and one senior officer, Detective Smith, threatened to "kick Steele's ass" after work; (3) after Steele was admitted to the VA hospital for chest pains (which he testified were a direct result of sustained retaliatory action), Brown removed his credentials; and (4) Steele was denied a bathroom break after being on shift for more than three hours and was threatened with disciplinary action when he took an unapproved bathroom break.[16]

On November 1, 2005, Steele filed an EEO complaint alleging that his September training class was cancelled in retaliation for providing testimony in support of Sawyer's allegations of discrimination against Brown. The complaint was dismissed by the VA on November 28, 2005, because Steele had missed the October 12, 2005 deadline for filing the complaint. This decision was affirmed by the EEOC on May 10, 2006. Steele filed subsequent EEO complaints alleging retaliation and a hostile work environment on November 29, 2005, and February 8, 2006, both based in part upon the suspension of his arrest authority and removal of his weapon and credentials. On June 21, 2006, Steele amended his EEO complaint to include his suspension as a further instance of retaliation.

---

[16] Steele suffers from hepatitis C that he contracted from a blood transfusion and as a result requires regular bathroom breaks. Management was aware of this and had never refused to grant Steele bathroom breaks before he testified in support of Sawyer's sexual harassment complaint. Steele further testified that his condition deteriorated as a direct result of ongoing harassment.

On September 6, 2006, the VA determined that, while Steele had made a *prima facie* case for retaliation, management had offered a nondiscriminatory explanation for removing Steele's police privileges and issuing a letter of suspension, and Steele had failed to demonstrate that these explanations were pretextual. The explanation offered for removing Steele's police privileges was that this is normal operating procedure when a police officer is under investigation for patient abuse. The explanation offered for Steele's suspension was management's interpretation of the AIB's findings – that Steele had acted inappropriately during the August 2005 arrest and had made false statements about the arrest to cover up his misconduct. Steele was never disciplined before he testified in support of Sawyer's EEO complaint.

### 4. *Renee Gustafson*[17]

Renee Gustafson was hired as a VA police officer at the JBVA facility in August 1999. In April 2004, the VA announced three promotion opportunities – one for a GS-7 (sergeant) position at the regional office building for Veteran's Benefits Assistance ("VBA") and two for GS-8 (lieutenant) positions at the JBVA facility. The VBA has its own director and its own building on VA property where veterans go to receive their monetary benefits. Veterans go to the JBVA Medical Center for medical treatment. JBVA supervisors manage a team of police officers who patrol the hospital campus and have the authority to issue disciplinary actions and performance appraisals, while the VBA supervisors manage the two or more officers who are stationed at the VBA building. The VBA supervisors do not have authority to issue disciplinary or performance appraisals. Gustafson does not dispute that the differences in the job duties were explained in the promotion announcements and reflected by the GS levels. In other words, prior

---

[17] As with Plaintiffs Steele and Green, Defendant did not file a response to Plaintiff Gustafson's Rule 56.1 Statement of Additional Material Facts [111]. Therefore, all of Plaintiff Gustafson's additional material facts are deemed admitted.

to applying for the positions, Gustafson was aware that these were different positions with different pay and responsibilities.

Gustafson applied for both the GS-7 position and the GS-8 positions. Five candidates were ranked as eligible for the GS-7 position, including Gustafson, and were referred for consideration in accordance with the VA's merit promotion policy. Fourteen candidates were ranked as eligible for the GS-8 position, including Gustafson, and were referred for consideration in accordance with the VA's merit promotion policy. On May 6, 2004, Karl Carter, a black male, was selected for promotion to the GS-8 position at the JBVA; on May 7, Gustafson, a white female, was promoted to the sergeant position at the VBA[18]; and on May 10, Barbara Jude, a black female, was promoted to the other GS-8 position at the JBVA. Although Gustafson usually was stationed at the VBA, she would occasionally fill in for supervisors at the JBVA.

Gustafson's original promotion to sergeant became effective on May 16, 2004. While Jude and Carter attended the classroom supervisory training session entitled "How to Supervise People," Gustafson was in Little Rock, Arkansas, attending training to become a police academy instructor. In July 2005, the VA inspected the programs at the JBVA. Among its findings were that supervisor training had not been accomplished; that supervisors needed to attend the facility's training course; and that it was recommended that the supervisors take the GSA online supervisor training course for guidance concerning appropriate supervisory level decision-making. Gustafson was able to complete much, although not all, of the coursework for the mandatory training online. Gustafson eventually received classroom supervisor training from an outside education institution in the summer of 2006.

---

[18] Gustafson subsequently was promoted to a GS-8 lieutenant position in September 2007.

As previously described, Renee Gustafson and co-Plaintiff Steele were involved in the arrest of a patient at the VBA on August 22, 2005. At the time of the incident, Gustafson was Steele's supervisor. The patient filed a complaint against Steele, and an AIB investigated the complaint. Although the original investigation targeted only Steele, Gustafson filed a voluntary witness statement. Gustafson's witness statement generally corroborated Steele's account of events. In particular, Gustafson alleged that the patient attempted to strike her before she and Steele began to arrest the patient. Steele initially thought this was the case, but also maintained that everything happened within a few "moments," and so the swing could have come before or during the arrest. Detective Smith later informed Gustafson that this witness statement had been lost, and asked her to submit a new statement. Gustafson testified in her deposition that Smith pressured her to change her statement to say that Steele had acted inappropriately. Gustafson further testified that she refused to do so and told Smith that she believed the action he was talking against Steele was illegal.

While only Steele was the subject of the first AIB, the second (or reopened) AIB also investigated Gustafson's involvement in the incident. According to Gustafson, she was not informed that her part in the incident was being investigated. The board concluded that the patient did attempt to strike Gustafson. However, as noted above, due to the poor quality of the surveillance footage, the board could not determine with 100% certainty whether the patient attempted to strike Gustafson before Steele moved to arrest the patient. The board also concluded that, because the event took place in a matter of moments, the officers may not have been able to accurately recall the exact sequence of events.

Brown suspended both Steele and Gustafson on the basis of the AIB report. Initially, only Steele was suspended. On June 9, 2006, Steele complained that the disciplinary action

taken against him was retaliation for testifying in support of Sawyer's allegations of sexual harassment against Brown. In making this claim he cited the fact that only he, and not Gustafson (who was involved in the incident but did not testify for Sawyer), was disciplined over the incident. Brown then proposed the suspension of Gustafson on June 23, 2006. Gustafson's suspension was approved and she served a fourteen-day suspension from July 30 to August 12, 2006. Gustafson was never disciplined by Brown before she provided a witness statement corroborating Steele's account of August 2005 arrest. Brown stated in his deposition that Gustafson's suspension was either for her part in incident or for the failure to fulfill her role as a supervisor. However, Gustafson was officially suspended for: (1) submitting a false written statement; and (2) providing false testimony to the AIB. Lampada completed the paperwork for Gustafson's suspension. As was the case with Steele's suspension, Lampada never received the AIB's additional findings and was instructed by Martin not to use these findings in completing the paperwork.

On July 20, 2006, Gustafson contacted an EEO counselor to complain of retaliation and discrimination on the basis of race and sex. Gustafson filed a formal complaint on August 16, 2006. She complained that she was suspended in retaliation for giving a witness statement that supported Steele and refusing to alter that statement to state that Steele had acted inappropriately. Her discrimination complaint was based on (i) her being promoted only to sergeant and not lieutenant and (ii) receiving inadequate training. She claimed that the decisions were motivated by her race (white) and sex (female).

## II.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs*., 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary

judgment.  See *id.*  Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases.  *Wallace*, 103 F.3d at 1396.

## III.    Analysis

### A.    Plaintiff Sawyer

#### 1.    Sawyer's Title VII Sexual Harassment Claim (Count II)

Sawyer claims that Defendant discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act.  Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex * * *."  42 U.S.C. § 2000e-2(a)(1).  To establish a *prima facie* case of hostile work environment sexual harassment, such as Sawyer is claiming, an employee must establish that (1) she was subjected to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability.  *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 788 (7th Cir. 2007) (citing *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 940 (7th Cir. 2007)).  The third prong of this test – the severity or pervasiveness of the harassment – has both an objective and a subjective component.  *Lapka v. Chertoff,* 517 F.3d 974, 983 (7th Cir. 2008) (citing *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 463 (7th Cir. 2002)).  The plaintiff may satisfy the subjective prong by presenting evidence that she in fact perceived her workplace as hostile or abusive.  *Hilt-Dyson,* 282 F.3d at 463.  In determining whether a workplace is objectively hostile, the court considers the totality of the circumstances, including the frequency and severity of the discriminatory conduct; "'whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance.'"  See *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)); *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1145 (7th Cir. 1997) ("Title VII is not directed against unpleasantness per se but only * * * against discrimination in the conditions of employment.") (quoting *Carr v. Allison Gas Turbine Div.,* 32 F.3d 1007, 1009 (7th Cir. 1994)).

Under Title VII, different standards of employer liability apply depending on whether the alleged harasser is the victim's supervisor or a coworker. An employer is strictly liable for harassment by a supervisor. *Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841, 848 (7th Cir. 2008) (citing *Velez v. City of Chicago,* 442 F.3d 1043, 1047 (7th Cir. 2006)).  A "supervisor" for Title VII purposes is "not simply a person who possesses authority to oversee the plaintiff's job performance, but a person with the power to directly affect the terms and conditions of the plaintiff's employment." *Id.*  (citation omitted).  This power includes generally "the authority to hire, fire, promote, demote, discipline or transfer * * *." *Id.* (citing *Rhodes v. Illinois Dept. of Transp.,* 359 F.3d 498, 506 (7th Cir. 2004)).  An employer is liable for harassment by a coworker only if it was negligent in discovering or remedying the harassment, that is, if the employer "knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 976 (7th Cir. 2004); *Williams v. Waste Mgmt. of Ill.,* 361 F.3d 1021, 1029 (7th Cir. 2004) ("Put differently, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.").

If the allegedly harassed employee did not suffer a "tangible employment action," such as discharge, demotion, or undesirable reassignment, the employer may raise the *Faragher/Ellerth* affirmative defense to avoid liability.  *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765

(1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998); see also *Phelan v. Cook County,* 463 F.3d 773, 783 (7th Cir. 2006) (citing *Faragher,* 524 U.S. at 807). To prevail on this defense, the employer must show (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) that the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807; *Phelan,* 463 F.3d at 783 (citing *Faragher,* 524 U.S. at 807). The *Faragher/Ellerth* defense is not available, however, if the employee suffered a "tangible employment action" as part of the alleged harassment. *Faragher,* 524 U.S. at 808 (citing *Ellerth,* 524 U.S. at 762-63; *Phelan,* 463 F.3d at 784-85).

It is undisputed that Chief Brown was Sawyer's direct supervisor at the VA, making Defendant strictly liable for any sexual harassment of Sawyer by Brown. Furthermore, as pointed out in Sawyer's response brief, Defendant did not raise an affirmative defense concerning Defendant's liability (nor did Defendant file a reply brief contesting Sawyer's assertion in her response brief that Defendant failed to raise this affirmative defense); thus, Defendant has waived any argument that he is not strictly liable for Brown's actions.

In his opening brief, Defendant argued that he is entitled to summary judgment on Sawyer's sexual harassment claim because Sawyer cannot show that Chief Brown's conduct toward her rose to the level of sexual harassment, or that the entire workplace environment was so sexually-charged as to amount to a hostile work environment filled with discrimination against women. Rather, Defendant contends that Brown's actions were merely "boorish, vulgar behavior."

To establish her hostile work environment claim, Sawyer must show that the alleged harassment was subjectively and objectively severe or pervasive. See *Whittaker,* 424 F.3d at

645. Defendant did not address the subjective hostility prong. Viewing the evidence in the light most favorable to Sawyer, the Court is satisfied that Sawyer found her work environment to be hostile and moves onto the objective prong.

In assessing whether Sawyer's work environment was objectively hostile, the Court considers the totality of the circumstances, including the frequency and severity of the discriminatory conduct; whether it was physically threatening or humiliating, or merely consisted of offensive utterances; and whether it unreasonably interfered with Sawyer's work performance. See *Faragher,* 524 U.S. at 787-88 (citing *Harris,* 510 U.S. at 23). Again, viewing the evidence in the light most favorable to Sawyer as the Court must at this stage of the case (*Foley*, 359 F.3d at 928), the offensive conduct at issue here occurred frequently: Sawyer claims to have been subjected to unwanted, inappropriate comments of a sexual nature for approximately one year, or the entire time that she was working for Chief Brown.

In evaluating severity, the Seventh Circuit has explained that on one side are sexual assaults, other physical contact for which there is no consent, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, and pornographic pictures; on the other side lies conduct that generally does not create a hostile work environment, such as "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Patton v. Keystone RV Co.,* 455 F.3d 812, 816 (7th Cir. 2006) (citing *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995)). Viewing the facts in the light most favorable to Sawyer, Brown (1) continuously made sexually explicit comments about Sawyer's body, including comments about her nipples and "ass," and also questioned what sexual acts she performed with her lips; (2) made comments about his own body and sex life, such as discussing his penis ("tube steak") and how women, including Sawyer, wanted some of his "tube steak"; (3) made references to

Sawyer engaging in sexual activity, such as having sex with or "running a train" on Plaintiff Steele,[19] engaging in a threesome with Steele and Watkins, and wanting to be "wolfpacked"[20]; (4) telling Sawyer she needed to go home and have sex; and (5) suggesting that Sawyer "would feel better if you had a little of my tube steak."

In *Quantock v. Shared Marketing Services, Inc.*, the Seventh Circuit viewed an employee's outright solicitation for numerous sex acts, which were made directly to the plaintiff, as more severe than "occasional vulgar banter tinged with sexual innuendo." 312 F.3d 899, 904 (7th Cir. 2002). The court held that a reasonable jury could find these sexual propositions sufficiently severe as to have created a hostile work environment. *Id.* The harassing employee in *Quantock* worked in close quarters with the plaintiff and held a significant position of authority over her; the harassing employee in this case, Brown, also worked in close quarters with Sawyer (indeed, Sawyer worked almost exclusively for Brown) and held a significant position of authority over her (as she was his secretary). Furthermore, Sawyer has set forth specific instances of harassment, identified specific comments with precise language, and has presented witnesses who corroborate some of her testimony. She has not set forth bald, conclusory allegations such as "I was sexually harassed" or "he talked about my body."

"In a typical case, it is a combination of severity and frequency that reaches the level of actionable harassment." *Patton v. Keystone RV Co*., 455 F.3d 812, 816-817 (7th Cir. 2006). This case provides such a combination. For the most part, Brown did not merely make gender-related jokes or engage in occasional teasing. Nor can Brown's conduct be described as

---

[19] Although neither party defines what it means to "run train," the common usage of to "run train" or "running train" is disturbing. The most vanilla explanation refers to a succession of men who line up to have intercourse with a woman. The term grows more degrading from there, as it often refers to employing several men for the express purpose of causing sexual pain to a woman. At its worst, the term refers to gang rape. See, *e.g.*, http://www.urbandictionary.com/define.php?term=running+train.

[20] As with "running train," the common usage of "wolfpacked" is degrading and disturbing.

infrequent. Construing all facts in Sawyer's favor, as this Court must, the Court views Brown's repeated statements to Sawyer as, at a minimum, approaching threatening and intimidating statements and not merely, as Defendant puts it, "boorish, vulgar behavior" or "occasional vulgar banter tinged with sexual innuendo" Viewing this verbal harassment as well as Brown's numerous comments about Sawyer's body in the light most favorable to Sawyer, the Court concludes that a trier of fact could find Brown's conduct sufficiently severe so as to have created a hostile work environment.

### 2. Sawyer's Title VII Retaliation Claim (Count IV)

Under the anti-retaliation provision of Title VII, it is unlawful for an employer to discriminate against an employee for opposing an unlawful employment practice or for making a charge, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing. *Brown*, 499 F.3d at 684 (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted). "Under the direct method, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.* at 663 (quotations and citations omitted). Alternatively, under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show that (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. See *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 560 (7th Cir. 2004). "'If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to present evidence of a non-discriminatory

reason for its employment action.'" *Tomanovich,* 457 F.3d at 663 (quoting *Adusumilli v. City of Chicago,* 164 F.3d 353, 362 (7th Cir. 1998)). Then, if the employer presents evidence of a non-discriminatory reason for its employment action, "'the burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual.'" *Id.* (quoting *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 903 (7th Cir. 2005)).

Sawyer classifies her case as a "mixed motive" case. In a mixed motive case, an employer may have a mixed motive, that is, more than one reason for firing an employee, but if the termination would not have occurred but for the retaliatory intent of the employer, then the termination is unlawful. See *Speedy v. Rexnord Corp.*, 243 F.3d 397, 401-02 (7th Cir. 2001). An employer accused of retaliating against an employee for exercising her rights under Title VII may avoid liability by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the plaintiff's protected activity into account. *Id.*; see also *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 893-94 (7th Cir. 1996) (in the face of direct evidence of retaliation, the employer must ultimately establish, by a preponderance of the evidence, that it would have taken the same action even if a desire to retaliate in no way tainted its decision making). However, "once the plaintiff has presented direct evidence that a forbidden factor contributed to the employer's decision to take adverse action against her, a trial will normally be necessary in order to determine whether the employer would have taken the same action in the absence of the illicit consideration." *Frobose v. American Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 615 n.12 (7th Cir. 1998). Only if the evidence "points inescapably" in the employer's favor (*Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 662 (7th Cir. 1991) (Flaum, J., dissenting), leaving no room for the factfinder to infer that the employer in fact discriminated or retaliated against the plaintiff, will the employer be entitled to summary

judgment.  *Frobose*, 152 F.3d at 615 n. 12.  Important to a mixed motive analysis is the temporal proximity between the time of the protected activity and the time in which the employer began to criticize or retaliate against the employee.  See *Speedy*, 243 F.3d at 403.

In her response brief, Sawyer contends that she was subjected to the following harassment after filing her EEO complaint:  (1) transfers between departments; (2) removal of purchasing and time-keeping duties; (3) unfounded AWOLs; (4) disrespectful comments about her EEO complaint; (5) surveillance by her supervisors; and (6) not being provided with the equipment necessary to do her job.  As a whole, Sawyer contends that "Defendant did everything possible to make [her] life miserable and to prevent her from doing her job."

Not all of what Sawyer views as retaliation satisfies the legal standards.  For instance, Sawyer's transfers were not adverse employment actions.  To recount, Sawyer initially was reassigned to the management services unit where she had worked prior to becoming the police chief's secretary.  Not long after, she alerted VA officials that she was uncomfortable working at the JBVC altogether, so she temporarily was assigned to a position answering phones for Katrina-disaster relief.  She then accepted a position at the logistics unit at the VA Lakeside campus and subsequently accepted a reassignment back to the police unit.  Finally, she was assigned as a clerk in the patient services unit.  She did not lose any benefits during the transfers, and she requested many of the transfers.  The Seventh Circuit repeatedly has held that a lateral transfer without a loss in benefits does not constitute an adverse employment action. See, *e.g.*, *Place v. Abbott Lab., Inc.*, 215 F.3d 803, 810 (7th Cir. 2000); *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 645 (7th Cir. 2000); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996).  The fact that Sawyer was not happy in the new positions is irrelevant when there is no evidence that the transfers decreased her responsibilities or benefits in any way.  See, *e.g.*, *Place*,

215 F.3d at 810 ("[B]eing shifted to an essentially equivalent job that [the plaintiff] did not happen to like as much does not a Title VII claim create."). Moreover, the majority of the transfers were made to appease Sawyer, who voiced concern or discomfort with a position.

Moreover, even if the transfers could rise to the level of adverse employment actions, no reasonable jury could find that Sawyer was transferred in *retaliation* for complaining of Brown's conduct. See, *e.g.*, *Place*, 215 F.3d at 811 ("an employer's decision to split up two workers whose interpersonal problems are impeding the company's progress is not retaliation"); see also *Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001) ("[e]ven if the transfer could rise to the level of an adverse employment action, summary judgment in favor of the IDOC was still appropriate because no reasonable jury could find that Stutler was transferred in retaliation for complaining of Rockett's conduct. Warden Gramley stated that he temporarily reassigned Stutler to the business office because he thought that relocating Stutler out of physical contact with Rockett might be a solution to the problem."). With respect to the first transfer, the VA reassigned Sawyer to separate the harasser from the victim. Although Defendant's decision to transfer Sawyer instead of Brown may not have been the wisest, Defendant has come forward with evidence that it was a business decision to transfer the secretary rather than the police chief – because the JBVA did not have an assistant chief – and Sawyer has not refuted this evidence. Furthermore, it was the tension that resulted from the collapse of Sawyer's and Brown's professional relationship, not retaliation, that led to the first transfer. With respect to the remaining transfers, they occurred either because Sawyer and her supervisor did not get along or because Sawyer wanted to be transferred and the VA accommodated her request. Plaintiff has not presented sufficient evidence to demonstrate that she was transferred in retaliation for her EEO activity.

Sawyer also asserts that the "continued" harassment that she endured after reporting Brown in August 2005 constituted an adverse employment action. The continued harassment includes unfounded AWOLs, relieving her of collateral job functions for department purchasing and time-keeping, disrespectful comments about her EEO complaint, surveillance by her supervisors, and not being provided with the equipment necessary to do her job. The Seventh Circuit has broadly defined an adverse employment action. *Smart*, 89 F.3d at 441. It is not limited solely to loss or reduction of pay or monetary benefits, but can encompass other forms of adversity. *Id.* Nevertheless, "not everything that makes an employee unhappy is an actionable adverse action." *Id.* In addition to lateral transfers (discussed previously), negative performance reviews, a change in job title, or an increased travel distance to work do not by themselves qualify. *Hill*, 218 F.3d at 645. Neither does the loss of a telephone or cubicle. *Place*, 215 F.3d at 810. To be actionable, there must be a "'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 555 (7th Cir. 2000) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). In other words, the adverse action must materially alter the terms and conditions of employment. *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996).

Sawyer cannot show harm or pretext when the police chief relieved her of collateral job functions for department-purchasing and time-keeping which she had been performing only because of a vacancy in another position. The chief reassigned those functions and the computer menus associated with these collateral functions were subsequently removed from her computer. See *Twisdale v. Snow*, 325 F.3d 950, 953 (7th Cir. 2003) (a lightened workload is actionable only if it impedes career prospects by depriving employee the opportunity to maintain and

improve skills). Sawyer has not demonstrated that the removal of these duties impeded her career prospects or resulted in a loss of pay or benefits. Furthermore, Sawyer has not demonstrated harm or pretext from the independent audit of her purchase records. Defendant has come forward with evidence that the audit was undertaken as a common practice to make sure that the successor employee performing these duties would not be held responsible for anything that occurred before, and Plaintiff has not demonstrated that Defendant's reason is phony. See *Twisdale*, 325 F.3d at 953 (unpleasantness caused by programs being audited falls short of severity required to trigger Title VII); *Kruger*, 420 F. Supp. 2d at 911 (audits are regular workplace occurrences that fall short of an adverse action). Finally, Sawyer cannot show harm or pretext when her time-keeper (not Brown) entered her as AWOL for August 17-18, 2005, after the operations desk failed to properly log Sawyer's phone-call requests for annual leave. Once Sawyer explained that she was sick, the AWOL entries were removed and Sawyer's leave records for August 16 and 17, 2005, reflect an entry for annual leave ("AL"). See *Bottoms v. Illinois DHS*, 174 F. Supp.2d 758, 766 (N.D. Ill. 2001) (restored leave credits and unauthorized absences that are later resolved fall short of adverse actions).

Sawyer claims that she did not have the equipment necessary to do her job because the file cabinet had been moved out of her office after she was transferred out of the police unit and was not immediately moved back when she returned. She also claims generally that Dunn never provided her with a job description or the necessary materials to complete her job. With respect to the file cabinet, it was moved because Sawyer, the secretary responsible for filing, was transferred. When Sawyer returned, the cabinet eventually was returned. The removal of the filing cabinet, even if was not immediately replaced upon her return, does not qualify as a significant change in employment status or as a decision that resulted in a significant change in

benefits. See, *e.g.*, *Place*, 215 F.3d at 810. The same holds true with respect to Sawyer's allegations that Dunn may not have given her a job description or all the equipment she needed to do her job. Sawyer does not point to any specific materials that Dunn failed to give her; rather, she merely claims that Dunn did not give her "the necessary materials to do her duties." This unsupported allegation does not qualify as an adverse employment action.

Retaliatory harassment by co-workers can rise to this level if it is severe enough to cause a significant change in the plaintiff's employment status. For example, in *Knox v. Indiana*, 93 F.3d 1327 (7th Cir. 1996), the Seventh Circuit upheld a jury verdict in favor of a plaintiff whose co-workers embarked on a campaign of vicious gossip and profanity aimed at making "her life hell" in response to her complaints that a supervisor sexually harassed her. The court reasoned that retaliation could come in many forms and there was sufficient evidence to support the jury's verdict that the plaintiff's co-workers engaged in a campaign of retaliatory harassment and the employer failed to correct it. *Id.* at 1334-35. However, in *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027 (7th Cir. 1998), the court found that ostracism by co-workers that did not result in material harm to the plaintiff was not enough to constitute an adverse employment action. *Id.* at 1039. Similarly, in *Bell*, the Seventh Circuit found that conduct by a supervisor was not sufficiently severe to be actionable. In *Bell*, the supervisor failed to greet or speak to the plaintiff and cancelled a meeting that the plaintiff had scheduled, apparently in response to the plaintiff's sex discrimination complaint. 232 F.3d at 555. The court found these matters trivial. *Id.* Likewise, in *Hill*, the court concluded that a supervisor's rummaging through the plaintiff's desk drawers and garbage can and listening to the plaintiff's telephone calls did not rise to the level of actionable retaliation. 218 F.3d at 645.

Taking the facts in the light most favorable to Sawyer, no reasonable jury could find that the conduct of Sawyer's fellow co-workers was severe enough to rise to the level of an adverse employment action. The conduct complained of after Sawyer confronted Brown in August 2005 consisted of (1) EEO officials notifying the wrongdoers of Sawyer's claims and testimony against them; (2) a "gag order" issued in the police unit not to discuss the ongoing EEO investigation; and (3) non-supervisor officers making snide comments and gossiping about her EEO complaint. With respect to the first contention, the VA's EEO headquarters informed Sawyer that EEOC regulations require the EEO counselor to inform responding management officials of the allegations made against them so that the alleged harassers can respond. As far as the "gag order," Defendant has presented evidence that an EEO official advised the acting police chief to inform staff that Sawyer was no longer working in the police unit and it was inappropriate to talk to her about her EEO case. Sawyer has presented evidence that some employees may have taken this directive too far, by ignoring her, making snide comments, or gossiping about her case. However, the evidence suggests that by instructing the employees not to discuss the case, management was trying to prevent the dissemination of inaccurate information or inappropriate comments directed at Sawyer, not sanctioning or condoning the offending employees. Even if some of her co-workers ignored her, talked behind her back, or made the occasional snide comment after she filed her claim, these relatively few incidents – in light of management's attempt to curb this from taking place at all – do not evince a retaliatory animus on the part of VA administrators. See, *e.g.*, *Parkins*, 163 F.3d 1027 (shunning is an adverse action only when it causes material harm); *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000) (colleague's failure to greet or speak to employee in response to sex discrimination complaint was too trivial); *Walker*, 408 F.3d at 334 (name-calling and hostility among the

workers was yet another iteration of inappropriate behavior that appeared to have been common at the facility); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (a dirty look or the silent treatment is insufficient). While her environment may have been unpleasant at times, this conduct did not constitute the material harm necessary for a Title VII retaliation claim.

The remaining question is whether the conduct of Dunn and Andersen effectively changed the terms and conditions of her employment. Sawyer cannot prevail on general allegations that logistics chief Dunn continually threatened her, spoke to her in an angry intimidating way, gave her an uneasy feeling and made her feel less of a person, was rude and disrespectful, hung up on her, told her she had a chip on her shoulder, and kept her under close surveillance. A plaintiff must identify specific instances, otherwise the claim is only conclusory. See *Lucas v. CTA*, 367 F.3d 714, 726 (7th Cir. 2004) (conclusory statements – without the times, dates or places which led to these conclusions – are not sufficient to avoid summary judgment); see also *Kruger v. Principi*, 420 F. Supp. 2d 896, 914 ("conclusory allegations * * * hold no weight"). For the few instances where Sawyer has provided specifics, she fails to demonstrate that these unpleasant encounters constitute adverse employment actions. *Grana v. Illinois DOT*, 232 F. Supp. 2d 879, 887 (N.D. Ill. 2002) ("Although [the plaintiff] may have felt uneasy and hurt, [his supervisors'] actions fall short of adverse employment action. [The plaintiff] may not enjoy his current situation, but a less-than desirable rapport with his supervisors does not constitute an adverse employment action"); *Herron*, 388 F.3d at 303 (difficulties with a manager is "normal workplace friction").

Clearly, Sawyer and Dunn did not get along; but Sawyer has failed to present sufficient evidence that Dunn's behavior toward her was in retaliation for Sawyer's complaints about Brown. Under the indirect method, Sawyer has failed to present evidence that similarly-situated

employees were treated differently by Dunn than Sawyer, and she also has failed to offer record evidence that she was satisfactorily performing her duties for Dunn. Under the direct method, she has failed to sufficiently demonstrate a causal connection between the lodging of her EEO complaint against Brown and her future problems with a new supervisor. Although Dunn knew about Sawyer's EEO activity, Dunn's conduct does not suggest that her dislike for Sawyer went beyond a personality conflict or her perception that Sawyer lied and was lazy. See *Nair v. Nicholson*, 464 F.3d 766, 769 (7th Cir. 2006) ("the motive must be to retaliate for activity protected by Title VII"). In response, Sawyer has not demonstrated that she was a model employee under Dunn's supervision or that Dunn's perception was unwarranted. The fact that there might have been tension and friction between Sawyer and Dunn, without more, is not indicative of retaliation, but perhaps of a difficult working environment and of differences of opinion within that environment – neither of which is actionable.

The same holds true for Sawyer and Andersen – although they did not get along, Andersen's actions do not constitute adverse employment actions and, furthermore, Sawyer has failed to demonstrate a credible link between any disagreements that she had with Andersen and her complaints about Brown. See *Nair*, 464 F.3d at 769 ("motive must be to retaliate for activity protected by Title VII"). Sawyer believes that they all stuck by each other to retaliate against her because they were all members of the Masons brotherhood or the Eastern Star sisterhood, but at the same time she acknowledges that she has no idea whether or not Andersen is actually a Mason, or whether or not either Dunn or Blakely is an Eastern Star. Other than pure speculation that a broad Masonic conspiracy was at play, Sawyer has failed to establish the causal connection between any disputes between her and Dunn or Anderson and her EEO claim. Instead of retaliation, there is plenty of evidence that both Dunn and Andersen were motivated by the fact

that personality conflicts were at play and that Sawyer was not performing her job duties as expected. The Court cannot adjudicate whether co-workers communicate well, whether Anderson or Dunn was insufficiently sensitive to Sawyer's emotional needs, and/or whether Dunn or Anderson "liked" Sawyer.

With respect to the leave disputes that Sawyer had with Dunn, Sawyer fails to demonstrate harm or pretext. After several leave disputes in October 2005, Dunn ended up approving her leave and removing all AWOL charges. After a leave dispute in January 2006, Sawyer failed to respond to Dunn's request that she explain her two-day absence from work, so Dunn entered Sawyer as AWOL for one day. First, it is questionable whether the loss of one or two days of wages is substantial enough to qualify as an adverse action. See *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (non-payment during a disputed work absence is not a quantitative or qualitative change in conditions of employment); *Rhodes v. Illinois DOT*, 359 F.3d 498, 505 (7th Cir. 2004) (loss of one day of wages is not substantial enough to qualify as adverse action). However, even if the loss of one or two days of wages does constitute an adverse employment action, Defendant has provided a legitimate business reason for the decision – specifically, that she failed to explain her absence upon request – and Sawyer has not demonstrated that Defendant's reason is a lie, for instance, by presenting evidence that she did explain her absence.

Sawyer also cannot show harm or pretext when she was reassigned back to the police unit. The JBVA Associate Director met with Sawyer face-to-face before authorizing this reassignment, specifically to determine whether Sawyer had reservations about returning to her secretary position at the JBVA. Sawyer expressed no reservations. Chief Brown had been designated the police chief at the Hines VA facility, but for approximately six weeks he was

acting chief at the JBVA while assistant chief Andersen was away for training. During those six weeks, Sawyer acknowledged that there was no inappropriate talk or conduct from Chief Brown, she "really didn't see him" very much, they did not really communicate except through e-mail, and he approved all of her leave requests. Furthermore, Sawyer cannot show harm or pretext when she was entered as AWOL or LWOP upon her return to the police unit. The time-keeper for the police unit stated that it was his mistake and he had already contacted payroll to have it corrected. Sawyer acknowledged that the LWOP was corrected and that she received her full salary for those days.

In light of the foregoing, the Court concludes that a reasonable fact-finder could not find that Sawyer was retaliated against for lodging an EEO complaint against Brown. However unpleasant Sawyer's work environment may have been, the actions that she complains of – including unfounded AWOL, the removal of certain duties and equipment, gossip, temporary transfers, and communication problems and difficulties with her supervisors – are not the kind of tangible job consequences that the Seventh Circuit has required employees to demonstrate in their retaliation actions. See, *e.g.*, *Rizzo v. Sheahan*, 266 F.3d 705, 718 (7th Cir. 2001) (affirming summary judgment on employee's retaliation claim because she had failed to show that she suffered a materially adverse employment action); see also *Haywood v. Lucent Technologies*, Inc., 323 F.3d 524, 532 (7th Cir. 2003) (noting that retaliation is not "mere unhappiness and inconvenience"). Taking all the facts in the light most favorable to Sawyer, and drawing reasonable inferences in her favor, the Court finds that Defendant is entitled to summary judgment on Sawyer's retaliation claim.

### B.    Plaintiff Green

#### 1.    *Green's Title VII Retaliation Claim (Count VI)*

As set forth in analyzing Sawyer's claims, Green may prove retaliation using the direct method or the indirect, burden shifting method.  Green contends that he can survive summary judgment under both methods.  Both the direct and indirect methods have in common a requirement that the plaintiff demonstrate an adverse employment action.  Green points to numerous instances of purported retaliation, including: (1) superior officers threatening him; (2) management failing to address concerns raised by him about the conduct of subordinate officers; (3) not placing him on the shift schedule for several months; (4) management giving written reprimands to him but not to other officers accused of the same conduct; and (5) demoting him for false reasons.

While the Seventh Circuit has emphasized that an adverse employment action need not be quantifiable in terms of pay or benefits, the conduct must result in material harm that alters the employment relationship.  See, *e.g, Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008).  This includes conduct that might dissuade a reasonable employee from lodging a discrimination charge.  See *Metzger v. Illinois State Police*, 519 F.3d 677, 683 (7th Cir. 2008).  As with Sawyer, not all of what Green views as retaliation satisfies the legal standard.  For instance, Green complained that he received a letter of reprimand, while Officer Manning did not, despite both of them engaging in the same behavior.  However, nothing went into either of their personal folders and Green has presented no evidence that this letter resulted in material harm to his employment.  See *Atanus*, 520 F.3d at 675 (admonishments that do not carry employment consequences do not constitute adverse action).  Green also complained of statements made in menacing tones to the effect that he should be careful what he says about Masons because anybody could be a Mason,

and they could come to Green's home and harm him. Again, Green has not identified any material harm that these statements caused. At worst, this qualifies as an isolated, vague, and somewhat bizarre threat, and without good reason to think that it would be acted upon, the threat is insufficient to dissuade a reasonable employee from engaging in EEO activity. See *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1030 (7th Cir. 2004) (noting that "it is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII."). Green complained that he was removed from the shift schedule for a period of several months. However, Green was verbally informed of his shifts by his supervisor and the omission never caused Green to miss work. While this might have been inconvenient and may have even made Green feel uncomfortable, he knew when his shifts were and his employment did not suffer because of it. Likewise, while it might have been frustrating when management failed to address concerns raised by him about the conduct of subordinate officers, Green does not present evidence of material harm stemming from this inaction. Having to rewrite a report multiple times and having to complete his own paperwork (per VA policy) required Green to do more work but, again, did not result in material harm to his employment.

By contrast, Green's demotion unambiguously qualifies as an adverse employment action. Having established an adverse employment action in the form of his demotion, under the direct method Green also must show that he engaged in statutorily protected activity and that there was a causal connection between this activity and the adverse employment action. Defendant does not contest that Green's EEO activity constitutes statutorily protected activity, and so the only remaining issue is whether there is sufficient evidence of a causal connection between the EEO activity and the demotion.

To show a causal connection, a plaintiff can rely on two types of evidence: direct evidence and circumstantial evidence. *Lewis v. School Dist. # 70*, 523 F.3d 730, 742 (7th Cir. 2008). Direct evidence does not require an inference or presumption to establish causality and typically takes the form of an admission by the employer of retaliatory intent. *Id.* There is no such admission here; thus, Green must rely upon circumstantial evidence to generate a material issue of fact with regard to the causal element. Circumstantial evidence allows the trier of fact to infer retaliation, typically through a longer chain of inferences. *Id.* Circumstantial evidence includes, among other things, suspicious statements, timing, or behavior. See *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736-37 (7th Cir. 1994).

Green argues that the timing of the decision to demote him is suspect. The proposal to demote Green occurred within five days after Green filed an EEO complaint. Although the proposal came relatively soon after the firearm distribution incident (and after Brown issued Green a letter of inquiry about the incident), the timing of Green's demotion is highly suspect, given that Brown did not recommend discipline in the weeks surrounding the incident. Although the Court cannot conclude that the timing of Green's demotion is dispositive on the causal element, it is highly suspicious.

Brown's justifications for demoting Green also raised serious questions about his actual motivation for demoting him. See *Flores v. Preferred Technical Group*, 182 F.3d 512, 516 (7th Cir. 1999). According to Defendant, Green was demoted on the basis of (1) failure to ensure that the police operations journal was annotated with an entry of missing government property; (2) failure to prepare a VA Police Uniform Offense Report; (3) failure to ensure the safety of a

subordinate officer by allowing him to work without a bullet resistive vest for twenty-five days; and (4) violating established firearm policy.[21]

In support of Green's demotion, Defendant claims that VA policy requires an officer's supervisor to submit a VA Police Uniform Offense Report and annotate the operations journal when the officer's bullet resistive vest goes missing. However, Defendant does not provide evidence of this policy or evidence that Green should have, or even could have, known about the policy. Green testified that while he did not annotate the police operations journal or prepare a VA Police Uniform Offense Report, he did inform his supervisors of the missing vest. This presents a genuine issue of fact about what Green knew, what he should have known, and whether Green's failure to submit a VA Police Uniform Offense Report or annotate the operations journal were grounds for demoting him.

With respect to Defendant's third reason – that Green failed to ensure the safety of a subordinate officer by allowing him to work without a bullet resistive vest for twenty-five days – there is no dispute that the VA requires officers to wear bullet resistive vests and that Green allowed an officer to work without a bullet resistive vest for a period of twenty-five days before filing a stolen property report. However, Green claims that he was unaware of this policy. Green also was not disciplined at the time of the incident. Furthermore, there is evidence of widespread ignorance and violation of the policy at the JBVA and yet Green was the only officer to be disciplined for failure to adhere to the policy.[22] Defendant provides no explanation for why

---

[21]   Defendant also raises the "butt chewing" Green received for his argument with another supervisor and the several rewrites Green was ordered to perform as evidence of unsatisfactory job performance. However, these incidents were not cited by Brown as reasons for demoting Green.

[22]   Around the time that Green allowed Chaney to work without a vest, more than half of the officers at the JBVA were working without fully functional vests, and some did not have vests assigned to them at all. Yet Green was the only supervisor disciplined for permitting a supervisee to work without a bullet resistive vest or for failing to report a missing vest.

Green and no one else was disciplined on these grounds. In the absence of any plausible alternative explanation for Green's differential treatment, a reasonable jury could conclude that the motivation for singling Green out was retaliatory. See, *e.g.*, *Speedy*, 243 F.3d at 401-02 (finding that defendant must go beyond merely demonstrating that an alternative explanation exists, and must affirmatively demonstrate that the decision was not influenced by the plaintiff's protected activity); *Amrhein*, 546 F.3d at 860-861 (J. Rovner, dissenting) ("An employer may well have a mixed motive, that is, more than one reason for firing an employee, but if the termination would not have occurred but for the retaliatory intent of the employer, then the termination is unlawful").

Whether Green breached the VA firearm policy also presents a genuine issue of material fact. On the one hand, three officers accused Green of using a master key to access their weapons in clear violation of VA firearm policy. Yet Green denies that this ever happened, and another officer – who Green's accusers allege was present at the time of the alleged infraction – denies witnessing the events as alleged. Green also has presented evidence that he could not possibly have opened the lockers without the officers' keys because he did not have access to the master key.

In sum, Green has presented sufficient evidence that a forbidden factor – his EEO claim – contributed to Brown's decision to demote him. See also *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir. 1997) (employee can prevail under Title VII so long as an illicit criterion played a motivating role in her discharge, even if another, legitimate criterion also played a role; once employee has presented direct evidence that a forbidden factor contributed to the termination, generally a trial will be required to determine whether the employer would have taken the same action in the absence of that factor). Unless a defendant presents undisputed

evidence that it would have taken the same action in the absence of any retaliatory intent, summary judgment is inappropriate. Green has provided sufficient evidence from which a reasonable jury could conclude that Defendant was motivated to demote Green based on his EEO conduct and that a causal connection between Green's protected activity and his demotion exists. Defendant has failed to refute this evidence – indeed, it is questionable whether Defendant even tried, as Defendant did not file a reply brief or respond to Green's Rule 56.1 Statement of Additional Material Facts. Thus, the Court concludes that a reasonable jury could find that Green's Title VII retaliation claim passes muster and summary judgment is not appropriate.

### 2. Green's Breach of Settlement Agreement Claim (Count VII)

"The United States, as sovereign, is immune from suit save as it consents to be sued * * *." *Frahm v. United States*, 492 F.3d 258, 262 (4th Cir. 2007) (quoting *United States v. Sherwood*, 213 U.S. 584, 586 (1941)). Congress waived sovereign immunity in Title VII, allowing the government to be sued as an employer. However, the scope of a waiver of sovereign immunity must be strictly construed in favor of the sovereign. See *Lane v. Pena*, 518 U.S. 187, 192 (1996). This statutory waiver does not expressly extend to monetary claims against the government for breach of a settlement agreement that resolves a Title VII dispute. The enforcement of a settlement agreement that resolves a Title VII claim is not itself a civil action claiming discrimination under Title VII, and Title VII contains no express indication of consent relating to claims alleging breach of settlement agreements stemming from suits under Title VII. Although the Seventh Circuit has not confronted the question of whether sovereign immunity extends to claims for breach of Title VII settlement agreements, two other Circuits, the Fourth Circuit and the Tenth Circuit, have answered this question in the negative for precisely

these reasons.  *Frahm*, 492 F.3d at 262; *Lindstrom v. United States*, 510 F.3d 1191, 1194 (10th Cir. 2007).

Additionally, "[t]he federal government may condition its waiver of sovereign immunity by requiring plaintiffs to follow specific procedures in order to recover." *Lindstrom*, 510 F.3d at 1194 (citing *San Juan County, Utah v. United States*, 503 F.3d 1163, 1175 (10th Cir. 2007) (en banc)).  EEO regulation 29 C.F.R. § 1614.504(a) explicitly limits the forms of relief that a plaintiff may seek if he or she believes that an agency has failed to comply with the terms of a settlement agreement:  either the terms of the agreement may be specifically implemented or the underlying EEO complaint may be reinstated for further processing.  *Frahm*, 492 F.3d at 262-3; 29 C.F.R. § 1614.504(a).  Both the Fourth and Tenth Circuits have held that parties are limited to these forms of relief when Title VII settlement agreements are breached.  *Frahm*, 492 F.3d at 262-3; *Lindstrom*, 510 F.3d at 1194.  This Court agrees with their reasoning.  Green should have followed the procedures set out in this regulation at the time he became aware of any breach of the settlement agreement, but he failed to do so.

Green urges the court to deviate from the Fourth and Tenth Circuits' reasoning, arguing that the two forms of relief provided by the regulation rely on voluntary compliance by the EEOC to enforce the settlement agreement, and that federal employees cannot rely on the EEOC's voluntary compliance to enforce settlement agreements when it already has breached those exact agreements.  Green's argument is unpersuasive.  The EEOC has not breached the settlement agreement between Green and the VA.  If the settlement agreement was in fact breached, it was breached by the Department of Veterans' Affairs, not the EEOC.  Not only does Green provide no reason for believing that the EEOC would have refused to enforce the

settlement agreement, he neglected to find out when he failed to follow the procedures set out in 29 C.F.R. § 1614.504(a).

Green also argues that barring recourse for Title VII settlement breaches in federal courts will lead to greater hesitation among federal employees to settle claims within the EEOC. However, even if the Court were inclined to agree with Green's prediction, it does not overcome the fact that the government has not consented to be sued for breach of Title VII settlement agreements. *Cf. Owens v. West*, 182 F.2d 180, 188 (D. Mass. 2001) (finding the fear that federal employees will be hesitant to settle claims compelling). Because Congress has not consented to being sued by federal employees to enforce settlement agreements that resolve Title VII disputes, a court does not have subject matter jurisdiction over a breach of settlement agreement claim. And because neither the settlement agreement nor any statute allows Green to sue the government for breach of the settlement agreement, summary judgment is appropriate on this claim.

### C. Steele

#### *1. Steele's Title VII Retaliation Claim (Count IV)*

Under Title VII, it is unlawful for an employer to retaliate against an employee for opposing discrimination or an unlawful employment practice. 42 U.S.C. § 2000e-3a; *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). To succeed on a retaliation claim, the plaintiff need not prove that the underlying conduct he opposed was actually serious enough to constitute a Title VII violation. Rather, the pertinent question is whether the employee subjectively believed he was opposing an unlawful practice – one that falls into the category of conduct prohibited by the statute. *Pickett v. Sheridan*, 610 F.3d 434, 441 (7th Cir. 2010) (holding that a plaintiff need not have opposed an action that in fact violated Title VII to win on

her retaliation claim; all that is required is that "she reasonably believe in good faith that the practice she opposed violated Title VII") (internal citations omitted); *Magyar v. Saint Joseph Regional Medical Center*, 544 F.3d 766, 771 (7th Cir. 2008). Steele engaged in protected activity for the first time when he participated in the informal investigation of Sawyer's EEO claim of sexual harassment on August 29, 2005.[23] Steele then continued to oppose the alleged sexual harassment when he testified against Brown and for Sawyer at the AIB hearing on September 14, 2005 and in the EEO investigation on November 28, 2005. Steele also engaged in protected activity by filing EEO complaints of his own for retaliation on November 1, 2005, November 29, 2005, and February 8, 2006.

Not only did Steele clearly engaged in a protected activity – testifying against Brown – he also clearly suffered an adverse employment action when he was suspended for fourteen days and lost pay and benefits. With respect to the third element under the direct method – establishing a causal connection between Steele's activity and the adverse employment action – the Court must resolve this issue without the benefit of a response by Defendant to Plaintiff's statement of additional material facts and without a reply brief from Defendant.

A causal connection can be established by "construing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision maker." *Sherrill v. Potter*, 2008 WL 4086980 *5 (N.D. Ill. August 25, 2008) (quoting *Nichols v. Southern Ill. Univ.*, 510 F.3d 772, 782 (7th Cir. 2007)). Such circumstantial evidence may include "suspicious timing, ambiguous statements, and patterns demonstrating differing treatment of similarly situated employees." *Id.* A causal link between the protected expression

---

[23] While Defendant maintains that there is no formal record of Steele giving testimony in support of Sawyer on August 29, 2005, Brown stated in his deposition that he learned that Steele had given testimony in support of Sawyer in late August or early September. When viewed in the light most favorable to Steele, the evidence is sufficient to allow a reasonable jury to conclude that Steele had given testimony on August 29, 2005, and that Brown was aware of it.

and an adverse employment action also may be established by showing that the protected conduct was "a substantial or motivating factor in the employer's decision." *Culver v. Gorman & Co.,* 416 F.3d 540, 545 (7th Cir. 2005).

Because there has been no admission of retaliatory intent, Steele must prove intent through circumstantial evidence. Viewing all of Steele's evidence together – and considering that much of it is not refuted by Defendant – Steele has amassed a "convincing mosaic of circumstantial evidence" allowing for the inference of discrimination. Viewing the facts in the light most favorable to Steele, Steele's work environment prior to and subsequent to his testimony against Brown was vastly different. Before testifying, the evidence indicates that Steele was a model employee who had never been investigated much less suspended. However, once Steele opposed Brown's conduct, Steele, at a minimum, was physically threatened, investigated for behavior for which he had not been investigated before, and eventually suspended.

Turning to specifics, the Court first notes that the timing of the AIB investigation is curious. The investigation was initiated on the same day as Steele's initial testimony in support of Sawyer. Brown admits to becoming aware of Steele's testimony around the time that it was given – namely, at the end of August or early September – and so it is possible that Brown found out about Steele's testimony that day and immediately initiated the AIB in retaliation. A reasonable jury could find that the timing of the AIB was more than mere coincidence, particularly given that Steele was never disciplined prior to testifying against Brown and that Steele initially was commended for the August 22 arrest. See *Lang v. Illinois Dept. of Children and Family Services*, 361 F.3d 416 419–20 (7th Cir. 2003) (finding sudden dissatisfaction with

employee's performance after engaging in protected activity provides circumstantial evidence of causation).

Furthermore, Defendant has failed to provide a compelling justification for initiating the AIB in this particular case or for Steele's unusual treatment while the AIB investigation was ongoing. The JBVA gets multiple patient abuse complaints every week. Most of these complaints are never investigated, including complaints that had been made against Steele before he spoke out against Brown. Defendant maintains that whether to investigate a patient abuse complaint is discretionary. But Defendant has failed to offer any explanation as to why the complaint against Steele was investigated when so many others were not. In other words, once Steele came forward with evidence that Brown's decision was motivated by a retaliatory intent, Defendant needed to come forward with evidence to refute this conclusion. Defendant, in choosing not to file a reply brief or a response to Steele's statement of additional material facts, severely hamstringed his efforts in that regard.

Furthermore, Steele has presented evidence that typically an officer's arrest authority, weapon, and credentials are not removed when he is the subject of an investigation into allegations of patient abuse. Yet Brown removed Steele's arrest authority, weapon, and credentials while the ten-month AIB was pending. Again, Defendant points out that this was within Brown's authority to do. But again, Defendant's argument fails to address the material issue of why the discretion was exercised in this case but not in any other case that has been brought to the Court's attention.

Furthermore, Steele argues that there is circumstantial evidence of retaliatory intent because the reasons that Brown supplied as justification for Steele's suspension were false. See *Flores v. Preferred Technical Group*, 182 F.3d 512, 516 (7th Cir. 1999). Brown gave three

reasons for suspending Steele: (1) using excessive force in the August 2005 arrest; (2) making a false written statement in an incident report; and (3) providing false testimony to an AIB. Defendant maintains that all three are justified by the AIB report; however, the second AIB report, which Brown directed HR not to use in drafting the suspension, stated explicitly that there was no evidence to indicate that undue force was used to arrest the patient. The second report also stated that any injuries the patient may have sustained were not the result of malicious action by Steele, and further, that its new findings were inconsistent with the conclusion in the first AIB report that Steele's original written report and testimony to the AIB were false.

Defendant contends that the second AIB report concluded that it could not be 100% certain of what happened and so a reasonable conclusion could be made either way. That argument is problematic for a couple reasons, at least when the facts are viewed in the light most favorable to Steele. First, the board concluded that the patient did at some point attempt to strike Gustafson, and "whether it happened as Officer Steele and Sgt. Gustafson initially approached him or immediately afterwards is only a difference of several moments." The board further stressed that in such situations "it can be difficult to recall the exact sequence of events." This suggests that, in the AIB's opinion, there is not a reason for supposing that any inaccuracies in Steele's report or testimony were deliberate or culpable. In addition, Defendant's argument does not address the fact that the AIB report flatly contradicts the notion that Steele used excessive force in arresting the patient. A reasonable jury could conclude from examination of the second AIB report that only a biased or malicious reading of the report could allow a reader to conclude that the AIB held open the possibility that Steele had lied to the AIB or that he had used excessive force. See *Flores*, 182 F.3d at 516 (noting that "a determination of whether a belief is honest is often conflated with an analysis of reasonableness. After all, the more objectively

reasonable a belief is, the more likely it will seem that the belief was honestly held."). Such a conclusion would allow a jury to infer that Steele's suspension was causally related to his EEO activity.

Looming large over all of this is the fact that only three officers were disciplined during Brown's tenure as Chief of Police at JBVA – Green, Steele, and Gustafson – and all three have engaged in EEO activity against Brown. The additional allegations of tampering with the video surveillance equipment and threatening Steele only further support the notion that there was a link between Steele's support of Sawyer and his subsequent treatment. See *Lewis*, 523 F.3d at 743-44; *Ogborn v. United Food & Commercial Workers Union,* 305 F.3d 763, 769 (7th Cir. 2002) (noting that evidence of tampering may be evidence of pretext, although ultimately denying the claim on other grounds). Taking all of the evidence in the aggregate and in the light most favorable to Steele, Steele has established a causal connection between his protected activity and his adverse employment action, and Defendant's motion for summary judgment as to Steele's retaliation claim is denied.

### D. Gustafson

#### 1. *Gustafson's Title VII Retaliation Claim (Count IV)*

To sustain a claim for retaliation under either the direct or indirect method, Gustafson must establish both that she engaged in protected activity and suffered an adverse employment action. While there is no dispute that Gustafson's fourteen-day suspension constitutes an adverse employment action, the parties dispute whether Gustafson engaged in protected activity prior to suffering the adverse employment action. Gustafson claims that she engaged in protected activity when she "refused to testify against Steele and/or when she refused to participate in retaliation against Steele." However, her testimony before the AIB in October 2005 and again in

March 2006 was related to the AIB's investigation of the patient abuse complaint, and was not related to any of Steele's EEO complaints. Gustafson argues that the AIB investigation was an act of retaliation against Steele for testifying in support of Sawyer's EEO investigation. She further contends that in refusing to change her statement and submit a false statement, she was refusing to assist in retaliation against Steele.

Under the participation clause of Title VII, employers are prohibited from retaliating against an employee who participates in any manner in an investigation, proceeding, or hearing under Title VII or assists a fellow employee in his or her Title VII action.[24] 42 U.S.C. § 2000e-3(a). Gustafson contends that her refusal to change her testimony before the AIB constitutes participation "in any manner in an investigation, proceeding, or hearing under Title VII." *Id*. The key difference between cases where participation (and even non-participation) has been found to be protected activity and the current situation is that, in the former cases, the participation was in EEO investigations, proceedings, or hearings. See, *e.g.*, *Merkel*, 787 F.2d at 178-79. Gustafson urges to the court to extend the reach of the participation exception to include non-participation in a hearing that is not related to an EEO investigation. Here, accepting Gustafson's version of the events, she was pressured to change a statement, but it was a statement that she made in an internal disciplinary proceeding, not in an investigation,

---

[24] Title VII generally protects only actual participation in Title VII activities. However, at least one circuit has recognized an exception to this general rule. See *Merkel v. Scovill, Inc.*, 787 F.2d 174, 179-80 (6th Cir. 1986). The exception provides protection to non-participation when an employer pressures an employee to give a statement it knows or should know to be false and the employee refuses. *Id.* Gustafson erroneously cites *Williams v. West*, a Seventh Circuit case, as endorsing this position. 1998 WL 904722, at *3 (7th Cir. 1998). In that case, the Seventh Circuit did not need to decide, and indeed refrained from deciding, whether to recognize the exception because the testimony that the *Wilson* plaintiff was pressured to give was not false. Whether the exception applies in the Seventh Circuit appears to be an open question, although at least one unpublished district court opinion recognized the exception in ruling on a motion to dismiss. See *Moss v. Lear Corp.*, 2007 WL 2901139 at *9 (N.D. Ind. 2007). As discussed below, even accepting the Sixth Circuit's reading, the Court finds that there is an independent ground for dismissing Plaintiff's retaliation claim.

proceeding, or hearing related to Steele's EEO claims. "The 'investigation' to which section 2000e-3 refers does not include an investigation by the employer, as distinct from one by an official body authorized to enforce Title VII." *Hatmaker v. Memorial Medical Center*, --- F.3d ---, 2010 WL 3385191, at *5 (7th Cir. 2010) (noting that "[t]o bring an internal investigation within the scope of the clause we would have to rewrite the statute")[25]; see also *EEOC v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (finding that "[participation] clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC"). In other words, "the participation clause is meant to protect employees who take part in or otherwise assist in an *EEOC* investigation; it is only those investigations that are conducted 'under' Title VII procedures." *Olsen v. Marshall & Ilsley Corp.*, 2000 WL 34233699, at *18 (W.D. Wis. 2000) (emphasis in original) (citing *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir. 1998)).

The AIB investigation was not an investigation conducted "under" Title VII procedures. While the AIB investigation serves as circumstantial evidence in support of Steele's retaliation claim – due to the timing and the fact that Steele had not been investigated in the past (prior to testifying for Sawyer) for similar conduct – finding that it also serves as a basis for Gustafson's retaliation claim takes things one step too far and would require the Court to read out of the

---

[25] In *Hatmaker*, the plaintiff spoke out against a co-worker, which prompted the employer to start an internal investigation to "rule out any kind of hostile work environment issue that might exist because [plaintiff's email] seemed to * * * suggest that that could be the case." *Hatmaker*, 2010 WL 3385191 at *2. Plaintiff subsequently was fired for her inability to overcome her negative opinions about the co-worker. Unlike the situation here, the internal investigation in *Hatmaker* was related to Title VII-type claims (specifically, sex discrimination and hostile work environment), yet the Seventh Circuit refused to consider the investigation as within the scope of the participation clause. Here, Gustafson's AIB statement did not have anything to do with race or sex discrimination, but rather related to the August 2005 arrest of a patient and Steele's role in that arrest.

statute the language in § 2000e-3(a) mandating that the participation be "in an investigation, proceeding, or hearing *under Title VII*." Participation in an investigation under Title VII is not the same as participation in any disciplinary or employment-related investigation, even if those proceedings later may be considered as evidence supporting a claimant's Title VII action. See also *Haymaker*, 2010 WL3385191 at *5-6 (declining to take a position on whether participation in an internal investigation begun *after* a charge is filed with the EEOC should be treated as participation in the official investigation, "on the theory, embraced by some courts, that any fruits of the participant's activity are bound to feed into that investigation"; however, noting that not only is this "not a road we want to go down; more to the point, Congress has not built such a road."). Thus, Gustafson's refusal to change her testimony in the AIB investigation is not a protected activity, and Gustafson has failed to meet her burden under the direct, indirect, or mixed-motive methods.[26]

### 2. Gustafson's Title VII Race and Sex Discrimination Claim (Count V)

Gustafson claims that Defendant discriminated against her on the basis of her sex and race (Caucasian) in violation of Title VII when Defendant promoted her to sergeant instead of lieutenant and when Defendant refused to provide her with mandatory supervisory training (unlike "non-white female employees"). Title VII prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer * * * to discharge any individual because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (explaining the misleading nature of this nomenclature and reiterating that the

---

[26] Gustafson has not pointed to any additional protected activity beyond her refusal "to testify against Steele and/or when she refused to participate in retaliation against Steele."

direct method may be proven with either direct or circumstantial evidence and that the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Plaintiff has chosen to proceed only under the indirect method. Under the indirect method of proof initially set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff first must establish a *prima facie* case of discrimination. 411 U.S. 792, 802-04 (1973). In order to establish a *prima facie* case of race, sex, and/or age discrimination, a plaintiff must establish that: (1) she was a member of a protected class; (2) she was qualified for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. See *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); see also *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Fane*, 480 F.3d at 538. A plaintiff shows that a reason is pretextual "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). An employer's decision to promote is pretextual when "it is a lie – a phony reason meant to cover up

a disallowed reason. Otherwise, an employer's decision to favor one candidate over another can be 'mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown.'" *Id.* (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002)). Plaintiff must "*specifically* refute facts which allegedly support the employer's proffered reasons"; conclusory statements about an employer's prejudice are insufficient to establish pretext. *Alexander v, CIT Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 890 (N.D. Ill. 2002) (emphasis in original).

Plaintiff alleges that she suffered two adverse employment actions: (1) Defendant promoted her to sergeant instead of lieutenant; and (2) Defendant refused to provide her with mandatory supervisory training. Plaintiff's one-sentence argument with respect to the first adverse employment action – being promoted to sergeant rather than lieutenant – is that "she was subjected to an adverse employment action first when she was not promoted to Lieutenant, as she should have been given her job responsibilities" and that "she lost pay by being at a lower Grade." In other words, Gustafson maintains that the VBA position should have had a promotion potential of GS-8, instead of GS-7. However, the record demonstrates that the promotional announcement for the VBA sergeant position explicitly stated a promotion potential to GS-7, while the announcement for the two JBVA positions explicitly stated a promotion potential to GS-8. The promotional announcements also specified different job duties. Gustafson acknowledged that "the two positions over at Jesse Brown were lieutenant positions and the one over at the VBA was a sergeant position, which is a 7." Gustafson applied for, and accepted, the GS-7 position. Gustafson has failed to put forth any evidence that discrimination played any part in her being promoted to the sergeant position over the lieutenant position,

particularly given that she knowingly applied for and accepted the GS-7 position and understood that it was offered at a lower grade level.

Perhaps the better argument would have been that she should have been promoted to the GS-8 positions at the JBVA instead of the GS-7 position at the VBA (instead of arguing that the GS-7 position should have been classified as a GS-8), but Gustafson does not make that argument. Or, if she intended to, she has failed to make out a *prima facie* case because she has failed to demonstrate that she was treated less favorably than employees outside her protected class who were similarly situated; that is, employees who were "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002). Although Gustafson alleges that Carter and Judge were similarly situated, she has not shown that, prior to the promotions, they held the same job description, were subject to the same standards, were subordinate to the same supervisor, and had comparable experience, education, and other qualifications. See *Ajayi,* 336 F.3d at 532. Nor has she attempted to demonstrate that she was more qualified than Carter or Jude for the GS-8 positions. See *Nichols v. Southern Illinois University-Edwardsville,* 510 F.3d 772, 780 (7th Cir. 2007) (finding that plaintiffs claims failed because plaintiffs failed to offer sufficient evidence that they were equally or more qualified than the two officers whom the department upgraded to the rank of sergeant). The burden to prove a *prima facie* case of discrimination rests with a plaintiff, and Gustafson has failed to marshal record evidence that she was similarly situated to either Carter or Jude.[27]

---

[27] Gustafson claims, without citation to record evidence, that she "can show that similarly situated employees, Jude (black, female) and Carter (black, male) received supervisor training when they were promoted to Lieutenant, which should have been the position to which Gustafson was promoted (given that she completed the same job duties and in fact substituted for them when they were on leave)." However, this statement does not demonstrate that *prior to* the promotions, she was similarly situated to Carter and Jude; rather, the statement merely claims (again, without citation to record evidence) that once they received their respective promotions, they had the same duties. What a plaintiff must demonstrate is

Gustafson also claims that Defendant's refusal to provide her with mandatory supervisory training constitutes an adverse employment action. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). For purposes of Title VII, the Seventh Circuit has articulated three general categories of actionable, materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Sun v. Bd. of Trs. Of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007) (internal citations omitted).

Here, Gustafson has not demonstrated any harm that resulted from the lack of training. See *O'Neal*, 392 F.3d at 912 (finding no adverse employment action where plaintiff presented no evidence that the employment action at issue caused harm). First of all, although she did not receive the classroom training in 2004 when she was promoted to sergeant, Gustafson completed most of the training online and also eventually received the classroom training. But more importantly, there is no evidence that the failure to receive the training immediately had a tangible effect on Gustafson's employment. See *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) (a plaintiff's subjective determination of harm cannot constitute an adverse employment action absent a tangible job consequence). Defendant presented evidence that, during the training course, supervisors learn about leave procedures, timekeeping, attendance

that prior to the adverse employment action, she was similarly situated to employees who received more favorable treatment.

problems, sick leave abuse, continuation of pay, discipline and performance problems, how to perform employee evaluations, how to fill out various forms, and how to network with the union. Out of this list, the only duty that Gustafson identifies not being familiar with (or trained on) was how to fill out leave requests. Yet she was never disciplined for failing to adequately perform this duty or rated negatively on evaluations for not having been trained on this issue. Nor was she ever reprimanded, disciplined, or evaluated negatively with respect to any of the duties or responsibilities listed above. Furthermore, Gustafson has not demonstrated that the lack of classroom training cost her money, reduced her career prospects, or made her feel humiliated or degraded in the workplace. See *Sun*, 473 F.3d at 812. In fact, in March 2007, Defendant promoted her to lieutenant.

Gustafson has failed to establish that Defendant's refusal to provide her with classroom training constitutes an *adverse* employment action or that similarly-situated employees were promoted over her. Accordingly, Plaintiff has not met her burden of establishing a *prima facie* case with respect to her allegation that Defendant discriminated against her on the basis of her sex and race in refusing to provide her with mandatory supervisory training or in failing to promote her to lieutenant in 2004. Therefore, as with Gustafson's retaliation claim, the Court grants summary judgment in favor of Defendant on Gustafson's Title VII discrimination claim.

## III.    Conclusion

For the reasons set forth above, the Court grants in part and denies in part Defendant's motion for summary judgment [78] on Plaintiff Sawyer's claims for retaliation in violation of Title VII (Count IV) and for hostile work environment-sexual harassment in violation of Title VII (Count II); grants in part and denies in part Defendant's motion for summary judgment [75] on Plaintiff Green's claims for breach of a settlement agreement in violation of Title VII (Count

VII) and for retaliation in violation of Title VII (Count VI); denies Defendant's motion for summary judgment [86] on Plaintiff Steele's claim for retaliation in violation of Title VII (Count IV); and grants Defendant's motion for summary judgment [92] in its entirety as to Plaintiff Gustafson's claims. Counts II (as to Sawyer), IV (as to Steele), and VI (as to Green) remain pending. The Court sets this matter for a status hearing on November 24, 2010, at 9:00 a.m.


Dated: November 1, 2010                    _____

                                           Robert M. Dow, Jr.
                                           United States District Judge